Anne Duffy POKORNY, Administratrix of the Estate of John Duffy, Deceased, Appellant,

v.

FORD MOTOR COMPANY, Appellee.

No. 89–1527.

United States Court of Appeals, Third Circuit.

Argued Jan. 24, 1990.

Decided April 30, 1990.

---

1. Judge Blumenfeld had died on November 5, 1988.

Hugh J. Bracken (argued), Richard A. Sprague, Sprague, Higgins, Creamer & Sprague, Philadelphia, Pa., for appellant.

Malcolm E. Wheeler (argued), Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., and Joseph V. Pinto, White and Williams, Philadelphia, Pa., for appellee.

Stephen M. Shapiro, Kenneth S. Geller, James C. Schroeder, Mayer, Brown & Platt, Chicago, Ill., for amici curiae, Product Liability Advisory Counsel, Inc. and Motor Vehicle Manufacturers Ass'n of the U.S., Inc.

Before HUTCHINSON, SCIRICA and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Anne Duffy Pokorny (Pokorny), administratrix of the estate of John Duffy (Duffy), appeals from a district court order granting summary judgment in favor of Ford Motor Company (Ford). Duffy died in a traffic accident while a passenger in a Ford van. Pokorny claims that the van was defectively designed. She contends that Ford's failure to provide adequate safety protection for passengers in its van was a design defect that subjected it to liability either in negligence or as a maker of a defective product. In particular, Pokorny alleges that the van should have been equipped with air bags, automatic seat belts or protective netting on the windows to prevent fatal injuries like those that Duffy suffered. The district court, adopt-

ing the reasoning of *Kolbeck v. General Motors Corp.*, 702 F.Supp. 532 (E.D.Pa. 1988), held that the National Traffic and Motor Vehicle Safety Act (Safety Act), 15 U.S.C.A. §§ 1381–1431 (West 1982 & Supp. 1990), and Federal Motor Vehicle Safety Standard 208 (Standard 208), 49 C.F.R. § 571.208 (1980),[1] impliedly pre-empted Pokorny's common law action and granted Ford's motion for summary judgment. *Pokorny v. Ford Motor Co.*, 714 F.Supp. 739, 742 (E.D.Pa.1989).

To the extent that the district court's judgment was based on Pokorny's assertion that the Ford van should have been equipped with air bags or automatic seat belts, we agree that the action was pre-empted by the Safety Act and Standard 208. Common law liability arising from the failure to install these two types of passive restraint systems would present an actual conflict with certain federal statutes and regulations. However, Pokorny's action is not pre-empted to the extent that it is based on other types of passive restraints, like the protective window netting she mentions, that do not present an actual conflict with federal laws or regulations.[2] Because we agree with some, but not all, of the district court's pre-emption analysis, we will affirm the court's judgment with respect to pre-emption of common law liability for any design defect arising out of Ford's failure to equip its van with air bags or automatic safety belts. However, because not all design defects arising from a failure to provide passive restraints pose an actual conflict with the Safety Act or Standard 208, we will reverse the district court's judgment in part and remand on the

question of whether Ford's failure to equip its van with passenger protective devices like window netting is a design defect actionable under the applicable Pennsylvania law of products liability.

I.

The facts relevant to our review of the order granting summary judgment to Ford are not in dispute. Duffy was a twenty-two year old Philadelphia police officer. He was killed in December 1983 when the 1981 model Ford Econoline police van in which he was riding collided with another police patrol car while responding to an emergency call. Duffy, a passenger in the van, was partially ejected through the passenger side window and crushed by the van when it turned over after the collision. At the time, he was not wearing the seat belt Ford had installed in the van in compliance with Standard 208.

Pokorny originally brought her action against Ford in a Pennsylvania state court. The complaint asserted numerous claims of negligence, strict liability and breach of implied warranties, all based on Ford's failure to install an appropriate passive restraint system for passengers in the 1981 van. Since there was diversity between the parties, the case was removed to the United States District Court for the Eastern District of Pennsylvania upon Ford's motion.

In the district court, Ford moved for summary judgment on all counts. It asserted that Pokorny's action was both expressly and impliedly pre-empted by the Safety Act and Standard 208. To support its claim of express pre-emption, Ford re-

---

1. This is the version of Standard 208 that was in effect when the 1981 Ford van was manufactured. The current version of Standard 208 is substantially similar. *See* 49 C.F.R. § 571.208 (1989).

2. The pre-emption question in this type of case often is discussed in terms of passive, or automatic, restraints, even though Standard 208 itself refers to automatic or passive protection systems. *See* 49 C.F.R. § 571.208, S4.1.2. *Cf. State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 476 (D.C.Cir.1986) (using the terms "passive restraints" and "passive protection devices" almost interchangeably), *cert. denied*, 480 U.S.

951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987). As we use the term, "passive restraints" includes any device intended to protect motor vehicle occupants from injury during a collision that is effective without affirmative action by the occupant. Under this usage, passive restraints are not limited to air bags and automatic seat belts. *See, e.g., Taylor v. General Motors Corp.*, 875 F.2d 816, 821 (11th Cir.1989) (cushioned-back seats constitute passive restraints, similar in effect to air bags), *cert. denied*, —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990). We do not think these differences in terminology affect the result in this case.

lied heavily on the pre-emption provision of the Safety Act, 15 U.S.C.A. § 1392(d) (West Supp.1990). That subsection provides, in relevant part:

Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.

Ford pointed out that the van in question contained combined lap and shoulder safety belts with a warning light and buzzer, one of the options enumerated in federal Standard 208.[3] Alternately, Ford argued that allowing Pokorny's action to proceed and exposing it to possible liability for its failure to install a passive restraint system created an actual conflict with the federal regulatory requirements that clearly gave automobile manufacturers the choice to install either manual safety belts *or* passive restraints. Therefore, according to Ford, Pokorny's common law action was also impliedly pre-empted by federal regulation.

Pokorny responded to Ford's arguments by relying on the savings clause of the Safety Act, 15 U.S.C.A. § 1397(k) (West Supp.1990).[4] This subsection provides that "[c]ompliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law." *Id.* Pokorny argued that § 1397(k)'s language demonstrates that Congress did not intend the Safety Act, or any federal standards

promulgated under it, to expressly pre-empt common law actions alleging liability for defectively designed vehicles. In addition, she argued that the cautious approach that federal courts should take in pre-emption matters precluded implied pre-emption of her action because there was no actual conflict between her theory of recovery and the options presented in Standard 208.

The district court concluded that Pokorny's action created an actual conflict with the options given to automobile manufacturers by the Safety Act and Standard 208. The court recognized that Standard 208 was specifically designed to give automobile manufacturers a degree of flexibility and choice in providing passenger restraint systems. It reasoned that allowing Pokorny's suit to go forward and exposing Ford to possible liability for failing to install a passive restraint system in the 1981 Ford van would, in effect, eliminate that flexibility and choice. Thus, the district court held that Pokorny's action was impliedly pre-empted by the Safety Act and Standard 208, and it granted Ford's motion for summary judgment on all counts. *See Pokorny,* 714 F.Supp. at 742–43.[5]

Pokorny now appeals the district court's judgment to this Court. We have appellate jurisdiction pursuant to 28 U.S.C.A. § 1291 (West Supp.1990). We exercise plenary review because the question of whether Pokorny's action is pre-empted by the Safety Act and Standard 208 arose during summary judgment proceedings and the resolution of that question involves a pure issue of law. *See International Union, United*

---

3. For 1981 model year passenger cars, Standard 208 requires automobile manufacturers to provide one of three types of occupant restraint systems. Standard 208 requires either: (1) an automatic system to protect passengers from both frontal and lateral crashes; (2) an automatic system designed to protect against frontal crashes, in combination with seat belts and a warning system; or (3) manual lap and shoulder belts with a seat belt warning system. *See* 49 C.F.R. § 571.208, S4.1.2. Manufacturers of 1981 multipurpose passenger vehicles with a gross vehicle weight rating of 10,000 pounds or less are given the same safety options as manu-

facturers of passenger cars, but they can also comply with Standard 208 by choosing one of two closely analogous options: (1) a complete automatic protection system or (2) a manual seat belt system. *See id.,* S4.2.1.

4. The savings clause was formerly codified at 15 U.S.C.A. § 1397(c) (West 1982).

5. Because the district court granted summary judgment to Ford on this ground, it did not consider other pre-emption arguments made by Ford, including its express pre-emption argument. *See Pokorny,* 714 F.Supp. at 742.

*Mine Workers v. Racho Trucking Co.,* 897 F.2d 1248, 1252 (3d Cir.1990).

## II.

In *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988), the Supreme Court recognized that federal pre-emption of state law can occur in three types of situations: where Congress explicitly pre-empts state law, where pre-emption is implied because Congress has occupied the entire field and where pre-emption is implied because there is an actual conflict between federal and state law.

A pre-emption question requires an examination of congressional intent. Of course, Congress explicitly may define the extent to which its enactments pre-empt state law. In the absence of explicit statutory language, however, Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law. Such a purpose properly may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where "the object sought to be obtained by the federal law and the character of the obligations imposed by it . . . reveal the same purpose." Finally, even where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law. Such a conflict will be found " 'when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.' "

*Id.* at 299–300, 108 S.Ct. at 1152–53 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, *rev'd,* 331 U.S. 247, 67 S.Ct. 1160, 91 L.Ed. 1468 (1947), and *California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 581, 107 S.Ct. 1419, 1425, 94 L.Ed.2d 577 (1987)) (citations omitted).

## A.

Initially, Ford contends that Pokorny's common law action is expressly pre-empted by § 1392(d), the pre-emption provision of the Safety Act. Ford notes that Standard 208, with its three basic options, defines the federal safety standard for passenger-side passive restraint systems. Therefore, it argues, § 1392(d) mandates that no state, and no political subdivision of a state, may establish a safety standard on this aspect of performance that differs in any way from the requirements of federal Standard 208. According to Ford, exposure to possible liability under state common law because of the absence of passive restraint systems for passengers has the effect of establishing a state standard within the meaning of § 1392(d), and thus such common law liability is expressly pre-empted if it is not identical to the requirements of Standard 208.

Ford's argument that Pokorny's common law action is expressly pre-empted by the Safety Act and Standard 208 is unconvincing, primarily because it focuses on one provision of the Safety Act, § 1392(d), without giving adequate consideration to the Act's savings clause, § 1397(k). The question of express pre-emption is properly analyzed only after considering both § 1392(d) *and* § 1397(k). *See American Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 513, 101 S.Ct. 2478, 2492, 69 L.Ed.2d 185 (1981) ("all parts of a statute, if possible, are to be given effect"); *Taylor v. General Motors Corp.,* 875 F.2d 816, 824 (11th Cir. 1989) (courts have a duty to give effect to every clause of a statute, if possible), *cert. denied,* —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Wood v. General Motors Corp.,* 865 F.2d 395, 420 (1st Cir.1988) (Selya, J., dissenting) (in construing statutes, court's role is to give effect to them as written and as a whole, not to enforce one section at the expense of another), *cert. denied,* —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990).

The cases that Ford cites in support of its arguments on express pre-emption— *Cox v. Baltimore County,* 646 F.Supp. 761, 763 (D.Md.1986); *Vanover v. Ford Motor*

*Co.,* 632 F.Supp. 1095, 1096–97 (E.D.Mo. 1986); and *Wickstrom v. Maplewood Toyota, Inc.,* 416 N.W.2d 838, 840 (Minn.Ct.App. 1987), *cert. denied,* 487 U.S. 1236, 108 S.Ct. 2905, 101 L.Ed.2d 937 (1988)—fail to give adequate weight to the effect of the savings clause on the question of express preemption. When we consider § 1397(k) together with § 1392(d), we conclude that Congress did not intend all common law actions for design defects like Pokorny's to be expressly pre-empted by federal regulations like Standard 208.

Ford, however, argues that § 1397(k) should be construed narrowly, since its limited purpose is to express Congress's intent not to pre-empt the entire field of automobile safety. In other words, according to Ford, § 1397(k) was enacted to ensure only that state common law continues to exist where no federal safety standard has been promulgated.

Ford's construction undermines the express language of § 1397(k). Section 1397(k) specifically recognizes that compliance with a particular federal safety standard, like Standard 208, does not exempt Ford from common law liability. *See Dawson v. Chrysler Corp.,* 630 F.2d 950, 958 (3d Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). The savings provision cannot be limited to matters not covered by the federal standards. We reject Ford's argument on this point and are not persuaded by the few district court opinions that have accepted it. *See, e.g., Cox,* 646 F.Supp. at 764. The language of § 1397(k) does not reasonably support that narrow construction. *See Taylor,* 875 F.2d at 824 ("Such a construction ... would render the savings clause a mere redundancy since the preemption clause itself provides that where a federal standard does not govern 'the same aspect of performance' as the state standard, the state standard is not preempted.").[6]

We also note that § 1392(d), the pre-emption provision, does not specifically mention common law liability. In the pre-emption clauses of many other statutes, Congress has explicitly referred to common law actions when it wished to pre-empt them. *See Taylor,* 875 F.2d at 824–25; *Cipollone v. Liggett Group, Inc.,* 789 F.2d 181, 185–86 (3d Cir.1986), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987); *Kolbeck v. General Motors Corp.,* 702 F.Supp. 532, 537 (E.D.Pa.1988) (§ 1392(d) only prohibits states from implementing their own safety standards; it does not directly address state common law).

Nevertheless, Ford argues that our construction of § 1397(k) is inconsistent with § 1392(d) because common law liability has the same effect on automobile manufacturers as the other kinds of state regulation that are expressly pre-empted by § 1392(d). Although we recognize that common law damages may have an effect on automobile manufacturers similar to other safety standards established by states through statutory or regulatory processes, common law liability and state regulation have important differences. *See Gingold v. Audi–NSU–Auto Union, A.G.,* 389 Pa.Super. 328, ——, 567 A.2d 312, 321–22 (1989); *Wood,* 865 F.2d at 423–24 (Selya, J., dissenting). Ford's hypothesis about the economic effect of common law liability is a question more properly addressed to Congress than to a court. The judiciary must adhere to the framework Congress designed when it enacted the Safety Act. As we construe that Act, common law liability survives federal regulation, even in those areas where federal safety standards have actually been established. Pokorny's common law action is not expressly pre-empted by § 1392(d).

**B.**

In the alternative, Ford contends that Pokorny's action is impliedly pre-empted by

---

**6.** We are also unpersuaded by the narrow construction given to the savings clause by the United States Court of Appeals for the First Circuit in *Wood v. General Motors Corp.,* 865 F.2d 395 (1st Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990).

There, the First Circuit, over Judge Selya's dissent, held that Congress did not foresee lawsuits claiming design defects when it enacted § 1397(k), and hence that section should not be construed to "save" such common law actions. *See* 865 F.2d at 402, 407.

the Safety Act and Standard 208 because the possibility of common law liability "would stand as an obstacle to the full accomplishment and execution of the federal purposes articulated by Congress and the Department of Transportation," Brief for Appellee at 13, and therefore would create an actual conflict with the flexible approach to passenger safety specifically established by federal law.[7]

It is well-established that federal law may impliedly pre-empt state law to the extent that the state law conflicts with a federal regulatory scheme. *See International Paper Co. v. Ouellette,* 479 U.S. 481, 490–92, 107 S.Ct. 805, 816–17, 93 L.Ed.2d 883 (1987); *Michigan Canners & Freezers Ass'n v. Agricultural Mktg. & Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2522, 81 L.Ed.2d 399 (1984). A federal regulation may have just as much pre-emptive effect as a federal statute. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Moreover, common law liability may create a conflict with federal law, just as other types of state law can. *See Taylor,* 875 F.2d at 826; *Cipollone,* 789 F.2d at 187. However, there is generally a presumption against pre-emption. *See Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981). Therefore, state law must create an actual conflict with a federal regulatory scheme before it is impliedly pre-empted.

### 1.

Before we determine whether, and to what extent, an actual conflict exists between federal law and the common law liability asserted by Pokorny, we address a few preliminary matters the parties raise in this appeal. First, despite Pokorny's arguments to the contrary, our decision in *Dawson* does not prohibit us from holding that Pokorny's common law action is impliedly pre-empted by the Safety Act and Standard 208. While *Dawson* held that an automobile manufacturer's compliance with federal safety standards could not be used as a defense foreclosing the possibility of finding that an automobile was defectively designed, *see* 630 F.2d at 957–58, that decision did not involve pre-emption. *Cf. Wood,* 865 F.2d at 401 n. 8. There was no federal standard governing the particular design said to be defective in *Dawson,* and thus there was no asserted conflict between federal standards and common law liability.

On the other hand, we cannot agree with Ford's suggestion that Pokorny's entire action should be dismissed because any other result would conflict with the Safety Act's goal of national uniformity in motor vehicle safety requirements. Certainly Congress was concerned with providing uniform safety standards while enacting the Safety Act. Evidence of this concern appears in § 1392(d), which prohibits state safety standards not identical to federal standards, and in selected passages of the Act's legislative history. *See, e.g.,* S.Rep. No. 1301, 89th Cong., 2d Sess. 12 (1966), *reprinted in* 1966 U.S.Code Cong. & Admin. News 2709, 2720.

However, uniformity was not Congress's primary goal in enacting the Safety Act. In 15 U.S.C.A. § 1381, Congress declared that the Safety Act's purpose was "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." Congress evidently thought that preserving common law liability would further the goal of motor vehicle safety, since § 1397(k) was included as part of the Act. *See Gingold,* 389 Pa.Super. at ——, 567 A.2d at 328–29. In the face of this clear declaration of congressional purpose, we are unwilling to accept an overly broad notion of pre-emption based on uniformity that could have the effect of undercutting Congress's concern for safety. *See Kolbeck,* 702 F.Supp. at 539. We prefer to analyze the pre-emption issue in a more cautious and precise manner, allowing pre-

---

7. Ford concedes that the third type of pre-emption discussed in *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988), is not applicable here, since § 1397(k) demonstrates that Congress did not intend to occupy the entire field of motor vehicle safety. We agree that Pokorny's common law action cannot be pre-empted on this basis.

emption of Pokorny's action only where it presents an actual, clear conflict with federal regulation. *See Northwest Cent. Pipeline Corp. v. State Corp. Comm'n,* 489 U.S. 493, 109 S.Ct. 1262, 1276, 103 L.Ed.2d 509 (1989) ("[C]onflict-pre-emption analysis must be applied sensitively ... to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role.").

### 2.

■ So analyzed, we conclude that Pokorny's action does present an actual conflict with the Safety Act and Standard 208 to the extent that it alleges liability for Ford's failure to include air bags or automatic seat belts on the passenger side of the 1981 van in which Duffy was killed. As the district court correctly recognized, Standard 208 was specifically designed to give automobile manufacturers a choice among several options when providing restraint systems for passengers. The van in which Duffy was killed contained manual safety belts and a buzzer system, one of Standard 208's options.

Allowing Pokorny to assert that the Ford van was defectively designed because it did not contain air bags or automatic seat belts frustrates the goals of the federal regulatory framework and undermines the flexibility that Congress and the Department of Transportation intended to give to automobile manufacturers in this area. Because potential common law liability interferes with the regulatory methods chosen by the federal government to achieve the Safety Act's stated goals, we think Pokorny's action is pre-empted to the extent that she alleges that the Ford van was defectively designed because it lacked air bags or automatic seat belts. *See Ouellette,* 479 U.S. at 494, 107 S.Ct. at 818.

The conflict between possible common law liability for failing to install air bags or automatic seat belts and the federal regulatory framework established pursuant to the Safety Act becomes clearer when we consider 15 U.S.C.A. § 1410b (West 1982).

Congress enacted § 1410b as part of the Motor Vehicle and Schoolbus Safety Amendments of 1974, *see* Pub.L. No. 93–492, § 109, 88 Stat. 1470, in direct response to the simmering controversy over safety belt interlock systems and certain proposed passive restraint requirements. *See* H.R. Rep. No. 1191, 93rd Cong., 2d Sess. 28–30 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 6046, 6073–75; Conf.Rep. No. 1452, 93rd Cong., 2d Sess. 25 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin.News 6084, 6108. Apparently there was significant concern among motorists that certain types of passive safety systems, most particularly air bags and automatic seat belts, could become mandatory in motor vehicles and that motor vehicles' ignitions soon would be designed not to start unless the occupants' seat belts were connected. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 34–37, 103 S.Ct. 2856, 2862–64, 77 L.Ed.2d 443 (1983).

In § 1410b, Congress addressed these concerns. It preserved manual seat belts as a continuing option for occupant restraint systems by providing that:

(2) Except as otherwise provided in paragraph (3), no Federal motor vehicle safety standard respecting occupant restraint systems may—

(A) have the effect of requiring, or

(B) provide that a manufacturer is permitted to comply with such standard by means of,

an occupant restraint system other than a belt system.

(3)(A) Paragraph (2) shall not apply to a Federal motor vehicle safety standard which provides that a manufacturer is permitted to comply with such standard by equipping motor vehicles manufactured by him with either—

(i) a belt system, or

(ii) any other occupant restraint system specified in such standard.

15 U.S.C.A. § 1410b(b) (in relevant part).[8]

Section 1410b shows, *inter alia,* that Congress intended manual seat belts to re-

---

**8.** "Belt system" for these purposes was defined   as "an occupant restraint system consisting of

main one of the options for complying with federal restraint system requirements, *see Taylor*, 875 F.2d at 826–27, at least insofar as the procedures in subsection (c) were not used to circumvent subsections (b)(2) and (b)(3)(A). The options presented by the Department of Transportation in Standard 208 reflect congressional intent, since they allow automobile manufacturers to comply with federal safety requirements by providing either a passive safety system, such as air bags or automatic seat belts, *or* manual safety belts.

That such flexibility and choice is an essential element of the regulatory framework established in Standard 208 has repeatedly been made clear in the regulatory history of this particular safety standard. *See, e.g.*, 49 Fed.Reg. 28962, 28997 (1984) (Secretary Dole explained that the flexibility and variety built into Standard 208 was needed to "provide sufficient latitude for industry to develop the most effective [occupant restraint] systems" and to help "overcome any concerns about public acceptability by permitting some public choice"); 46 Fed.Reg. 53419 (1981) (Secretary Lewis determined that air bags and automatic seat belts should not be required, but each should remain only one alternative among several options in satisfying occupant restraint requirements); 42 Fed.Reg. 5071 (1977) (Secretary Coleman

relied on a 1976 document entitled "The Secretary's Decision Concerning Motor Vehicle Occupant Crash Protection" to conclude that passive restraint systems should not be mandated at the time due to public uncertainty). The regulatory history shows that the Department of Transportation, consistent with Congress's intent in § 1410b, rejected the idea that air bags or automatic seat belts should become a mandatory requirement for occupant safety at the time this Ford van was manufactured. *See, e.g.*, 49 Fed.Reg. 29000 (1984) (Department of Transportation "determined that airbags should not be required in all cars"); 42 Fed.Reg. 5071 (1977) (after considering several alternate approaches to occupant safety under Standard 208, Secretary of Transportation rejected alternatives "mandat[ing] passive restraints on some or all passenger cars" and continued with approach allowing use of manual seat belts).[9]

Allowing Pokorny, and others in similar situations, to allege common law liability for the failure to install air bags or automatic safety belts would directly undermine the regulatory framework suggested by Congress in § 1410b and implemented by the Department of Transportation in Standard 208. These aspects of Pokorny's common law action are pre-empted. *See Taylor*, 875 F.2d at 827 (Eleventh Circuit

integrated lap and shoulder belts for front outboard occupants and lap belts for other occupants." 15 U.S.C.A. § 1410b(f)(2).

In § 1410b, Congress did provide a way to circumvent the limitations it had established in subsections (b)(2) and (b)(3)(A). A safety standard could be promulgated that conflicted with subsections (b)(2) or (b)(3)(A) if certain procedural requirements were followed during its promulgation. *See* §§ 1410b(b)(3)(B), 1410b(c). The key procedural requirement in these situations was congressional notification, which would allow both Houses of Congress to consider the proposed standard and determine whether it should become effective. If both Houses passed concurrent resolutions disapproving of the proposed standard, then the standard was to be ineffective. *See* § 1410b(d)(1). Of course, after the Supreme Court's holding in *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the "congressional veto" scheme devised in § 1410b is no longer available. However, Congress's inclusion of such a check in § 1410b reinforces the inference that it re-

mained wary about safety standards that did not include an option for manual safety belts.

9. More recently, the Department of Transportation has taken some steps to slowly phase in automatic restraint system requirements for passenger cars manufactured after 1986. *See* 49 C.F.R. § 571.208, S4.1.3–4.1.4 (1989). However, until September 1993, manufacturers may continue to provide manual seat belts on the passenger's side of vehicles that have air bags on the driver's side. *See id.*, S4.1.4. Moreover, until April 1, 1989, it was unclear whether the automatic restraint system requirements would become effective, since the Secretary of Transportation was authorized to eliminate the requirements if enough states passed mandatory seat belt use laws. *See id.*, S4.1.5. The requirements themselves are limited to passenger cars and do not apply to multipurpose vehicles.

Despite this evolution, we remain convinced that both Congress and the Department of Transportation did not want to mandate the use of air bags or automatic safety belts when Ford manufactured this Econoline van in 1981.

applied holding of *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), that "a state common law rule cannot take away the flexibility provided by a federal regulation, and cannot prohibit the exercise of a federally granted option"; since plaintiffs' theory of recovery, based on manufacturers' failure to equip certain motor vehicles with air bags, effectively would remove the element of choice provided in Standard 208, plaintiffs' actions were impliedly pre-empted); *Kitts v. General Motors Corp.,* 875 F.2d 787 (10th Cir.1989) (plaintiffs' air bag claims impliedly pre-empted by Safety Act), *cert. denied,* —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Wood,* 865 F.2d at 402, 408–14 (defective design action based on lack of air bags in motor vehicle impliedly pre-empted); *Kolbeck,* 702 F.Supp. at 541–42 (although an "extremely close issue," court held that Safety Act and Standard 208 pre-empted common law damage claim for failure to provide a passive occupant restraint system); *Nissan Motor Corp. v. Superior Court (Meier),* 212 Cal.App.3d 980, 261 Cal. Rptr. 80 (Ct.App.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1782, 108 L.Ed.2d 784 (1990).

The Safety Act's savings clause does not change our resolution of the pre-emption issue, since it is well-established that a savings clause like § 1397(k) does not "save" common law actions that would subvert a federal statutory or regulatory scheme. *See Ouellette,* 479 U.S. at 492–94, 107 S.Ct. at 817–18; *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 328–31, 101 S.Ct. 1124, 1135–37, 67 L.Ed.2d 258 (1981); *Pennsylvania R.R. v. Puritan Coal Mining Co.,* 237 U.S. 121, 129, 35 S.Ct. 484, 496, 59 L.Ed. 867 (1915); *Texas & Pac. Ry. v. Abilene Cotton Oil*

*Co.,* 204 U.S. 426, 446, 27 S.Ct. 350, 357, 51 L.Ed. 553 (1907).[10]

Pokorny's assertion that there is no actual conflict between federal law and the imposition of common law liability for failing to provide air bags or automatic safety belts is unconvincing. A few courts have held that there is no conflict between Standard 208 and common law liability in this type of situation since common law liability would not compel automobile manufacturers to install certain types of passive restraints and, in any event, it is possible for them to meet both federal and state requirements; for example, a manufacturer could install air bags or automatic seat belts. *See, e.g., Gingold,* 389 Pa.Super. at ——, 567 A.2d at 325–27. However, we think that *Kolbeck* is more attuned to the realities of such a situation: " 'An automobile manufacturer faced with the prospect of choosing the [passive restraint options], or facing potential exposure to compensatory and punitive damages for failing to do so, has but one realistic choice.' " 702 F.Supp. at 541 (quoting *Baird v. General Motors Corp.,* 654 F.Supp. 28, 32 (N.D. Ohio 1986)). Because common law liability for failing to provide passenger-side air bags or automatic seat belts would undermine the option of meeting federal safety standards by providing a manual seat belt system like that in the Ford van in which Duffy was killed, an option that Congress and the Department of Transportation clearly intended to preserve, Pokorny's action is pre-empted to the extent that it is based on this theory of recovery.

### 3.

■ We think Pokorny's action is not pre-empted, however, to the extent that it

---

**10.** On this issue, we do not find the analysis in *Gingold v. Audi–NSU–Auto Union, A.G.,* 389 Pa. Super. 328, ——, 567 A.2d 312, 324–27 (1989), persuasive. In *Gingold,* the Pennsylvania Superior Court concluded that the Safety Act's savings clause permitted an action for design defect based on the lack of any type of passive restraint system, even though it appeared to conflict, at least in part, with the Act and Standard 208. That court determined that there could be no conflict between the federal regulatory

scheme and possible common law liability in such a situation, since it construed § 1397(k) to preserve an individual's common law remedies without limitation. However, because of the actual conflict that exists between Standard 208 and common law actions based on the absence of air bags or automatic safety belts, we believe the better approach is to construe § 1397(k) to permit only those common law actions for design defect that do not frustrate or undermine the Safety Act's regulatory framework.

asserts liability for Ford's failure to provide protective netting over the van's windows. Potential liability for this type of passive system, unlike liability for failing to provide air bags or automatic seat belts, presents no direct, actual conflict with Standard 208's regulatory framework. It does not take away the flexibility established by the federal scheme, and it does not have the effect of prohibiting an option granted by Congress or the Department of Transportation. *Cf. de la Cuesta*, 458 U.S. at 154–56, 102 S.Ct. at 3023–24 (state court limitations on federal savings and loan's ability to enforce due-on-sale clauses deprived lender of flexibility given to it by the Federal Home Loan Bank Board and conflicted with Board's express policy on such clauses). Because of the significant difference between common law liability predicated on the failure to provide air bags or automatic seat belts and liability based on the absence of protective window netting or other possible non-conflicting designs reasonably adapted to increase passenger safety, Ford's argument that we should not make a distinction among particular types of passive restraints and should simply hold that *all* safety alternatives not included in Standard 208 are pre-empted does not persuade us.[11]

A state's common law, imposing liability because the absence of protective window netting is a design defect, would not, to our mind, frustrate the purpose of the federal regulatory scheme. The options set forth in Standard 208 would not be undermined in such a situation, and manual safety belts in particular would remain a viable option. Common law liability simply would "encourage" automobile manufacturers to provide safety features in addition to those listed in Standard 208.

Congress clearly expressed its main purpose as promoting safety when it enacted the Safety Act. *See supra*, at 1122 (discussing 15 U.S.C.A. § 1381). Our result is consistent with that purpose and with the federal regulatory scheme established pursuant to the Safety Act. We do not think that Congress or the Department of Transportation intended to "freeze" motor vehicle safety design with either the Safety Act or Standard 208. Therefore, we will not use the pre-emption doctrine in a manner that would have that effect. Thus, we hold that Pokorny's claim against Ford for defective design in failing to include protective netting over the windows is not pre-empted.

### III.

For the foregoing reasons, the district court's order granting summary judgment to Ford will be affirmed in part and reversed in part. To the extent that Pokorny's action is based on the lack of air bags or automatic safety belts in the 1981 Ford van, it is pre-empted by the Safety Act and Standard 208. To the extent that it is based on the absence of protective netting over the van's windows, however, it is not pre-empted because there is no actual conflict with the federal regulatory scheme. We will remand to the district court for

---

**11.** We recognize that other courts addressing similar questions on pre-emption in the context of the Safety Act and Standard 208 have not made the distinction among passive systems that we make here. However, most of those cases involved only the pre-emption of common law actions based on the failure to include air bags. *See, e.g., Taylor v. General Motors Corp.*, 875 F.2d 816 (11th Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Kitts v. General Motors Corp.*, 875 F.2d 787 (10th Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *Wood v. General Motors Corp.*, 865 F.2d 395, 396–97 (1st Cir.1988) (although plaintiff's complaint alleged a defective design since General Motors "failed to provide reasonably safe and adequate safety devices, which include but are not limited to 'air bag' devices," the First Circuit limited its review to "whether federal law preempts a state law product liability claim against a motor vehicle manufacturer based on its installing seat belts, rather than airbags, in a motor vehicle"), *cert. denied*, — U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990). *But see Kolbeck v. General Motors Corp.*, 702 F.Supp. 532, 534 (E.D.Pa. 1988) (finding pre-emption where plaintiff's claim asserted defective design because of the absence of a "passive restraint system such as airbags, an energy absorbing interior, or automatic seat belts"). Here, we think that it is proper to examine each aspect of Pokorny's action independently to determine whether it is pre-empted by the Safety Act and Standard 208.

further proceedings consistent with this opinion.