BALDWIN, Appellant,

v.

## GOLDEN HAWK TRANSPORTATION COMPANY
et al.; Transcraft, Inc., Appellee.

[Cite as *Baldwin v. Golden Hawk Transp. Co.*, 160 Ohio App.3d 399, 2005-Ohio-1643.]

Court of Appeals of Ohio,
Fifth District, Richland County.

No. 04–CA–49.

Decided April 4, 2005.

John R. Wienold and Larry M. Amoni, for appellant.

Christopher Weber, for appellee.

BOGGINS, Judge.

{¶ 1} This appeal is from a summary judgment adverse to appellant.

## STATEMENT OF THE FACTS AND CASE

{¶ 2} The facts are that appellant was traveling on State Route 598 on April 30, 1999, at about 2:30 a.m.

{¶ 3} At that time, a semi with a flatbed trailer was being driven by Terrence L. Sautter II. While attempting to back the trailer, Mr. Sautter had caused the flatbed trailer to block both lanes of the roadway.

{¶ 4} Appellant asserts that she did not see the trailer and as a result, she struck it and went under it and received serious injuries.

{¶ 5} The trailer was manufactured by appellee Transcraft in 1992.

{¶ 6} It was not equipped with either retroreflective tape, which would make the trailer visible in headlights, nor underride protection, designed to prevent vehicles from continuing under the trailer bed upon impact.

{¶ 7} In 1993, Congress required flatbed trailers to have conspicuity tape. Thereafter, appellee installed this tape on its manufactured trailers and offered tape kits to owners of pre–1993 trailers.

{¶ 8} The assignment of error is:

## ASSIGNMENT OF ERROR

{¶ 9} "I. The trial court erred in granting summary judgment in favor of Transcraft based upon the law of Ohio relating to summary judgments on the issues of negligence and strict products liability and punitive damages."

## I

{¶ 10} Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court did. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 36, 30 OBR 78, 506 N.E.2d 212. Civ.R. 56(C) states:

{¶ 11} "Summary Judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law * * *. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."

{¶ 12} Pursuant to the above rule, a trial court may not enter a summary judgment if it appears that a material fact is genuinely disputed. The party moving for summary judgment bears the initial burden of informing the trial court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The moving party may not make a conclusory assertion that the nonmoving party has no evidence to prove its case. The moving party must specifically point to some evidence that demonstrates that the nonmoving party cannot support its claim. If the moving party satisfies this requirement, the burden shifts to the nonmoving party to set forth specific facts demonstrating that there is a genuine issue of material fact for trial. *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 429, 674 N.E.2d 1164, citing *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264.

{¶ 13} It is based upon this standard that we review appellant's assignment of error.

{¶ 14} In its entry of March 29, 2004, the court stated:

{¶ 15} "Defendant Transcraft, Inc. has filed a motion for Summary Judgment on plaintiff's claim of negligence in Transcraft's alleged failure to manufacture the trailer in question with retro reflective tape. Plaintiff apparently claims that had the trailer been equipped with retro reflective tape at the time of the accident, she would have had a better chance of seeing the trailer and would have had a better chance of avoiding the collision that occurred.

{¶ 16} "Defendant counters that the trailer in question was manufactured and delivered by defendant before Federal regulations required the use of retro

reflective tape on commercial flat bed trailers and that the trailer, when manufactured, was in compliance with all applicable Federal regulations.

{¶ 17} "Plaintiff has failed to suggest any evidence that Transcraft, Inc. was in any way negligent in its manufacture of the trailer in question. The trailer manufactured by defendant met Federal guidelines and that the law changed and the trailer may not have had retro reflective tape on it at the time of collision can not be laid at the feet of Transcraft, Inc."

{¶ 18} The entry was amended on May 4, 2004, to include the Civ.R. 54(B) language and this appeal was timely filed.

{¶ 19} The appellee's Civ.R. 56 motion was legally premised primarily on compliance with federal regulations at the time of manufacture, preemption as to retroreflective tape by adoption of the 1993 federal regulations, and the inapplicability of punitive damages.

{¶ 20} The response to that motion, which addressed the applicability of federal preemption, also provided reports indicating the knowledge of the trucking industry since 1960 as to national recognition of the safety features of reflective tape and underride guards.

{¶ 21} The court's decision did not address underride guards or punitive damages.

{¶ 22} On the issue of preemption, appellee reviewed the effect of *Geier v. Am. Honda Motor Co.* (2000), 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914, on the federal regulations adopted pursuant to the National Traffic and Motor Vehicle Safety Act, as amended, and on the prior ruling of the Ohio Supreme Court in *Minton v. Honda of Am. Mfg.* (1997), 80 Ohio St.3d 62, 684 N.E.2d 648.

{¶ 23} In *Minton,* the Ohio Supreme Court, in a case involving the absence of an air bag and the effectiveness of the type of seat belt in a Honda automobile, quoted the federal act:

{¶ 24} " 'Whenever a Federal motor vehicle safety standard established under this title is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment *any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard.* Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a

higher standard of performance than that required to comply with the otherwise applicable Federal standard.' (Emphasis added.) Former Section 1392(d), Title 15, U.S.Code (now found, substantively unchanged, at Section 30103[b][1], Title 49, U.S.Code). As a specific exception to the preemption clause, the Safety Act also contains a savings clause. The savings clause stated that '[c]ompliance with any Federal motor vehicle safety standard *issued under this subchapter does not exempt any person from any liability under common law.*' (Emphasis added.) Former Section 1397(k), Title 15, U.S.Code (now found, substantively unchanged, at Section 30103[e], Title 49, U.S.Code)." *Minton,* 80 Ohio St.3d at 67–68, 684 N.E.2d 648.

{¶ 25} The court then reviewed Clause 2, Article VI of the federal Constitution (the Supremacy Clause) with respect to express and implied preemption and stated:

{¶ 26} "More concisely, federal preemption of state law can occur in essentially three instances: (1) where Congress expressly preempts state law (express preemption); (2) where Congress has occupied the entire field (field preemption); or (3) where there is an actual conflict between federal and state law (conflict preemption). Field and conflict preemption are both forms of implied preemption. See *Gade v. Natl. Solid Wastes Mgt. Assn.* (1992), 505 U.S. 88, 98, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73, 90.

{¶ 27} "The critical question in any preemption analysis is whether Congress intended state law to be superseded by federal law. *In re Miamisburg* [1994], 68 Ohio St.3d [255] at 260, 626 N.E.2d [85] at 89, citing *Cipollone v. Liggett Group, Inc.* (1992), 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 422." Id., 80 Ohio St.3d at 69, 684 N.E.2d 648.

{¶ 28} In its conclusion, the court in *Minton* held that preemption was inapplicable.

{¶ 29} *Geier,* supra, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914, differed on the facts and in Justice Breyer's conclusions.

{¶ 30} While the *Geier* case also involved the absence of an air bag in a Honda vehicle, the court held that the applicable District of Columbia statute conflicted with the federal regulations in that it mandated air bags, while the federal regulations gradually phased in such requirements, and that meant preemption applied.

{¶ 31} Because of the conflict affecting the phase-in intention of Congress relative to seat-belt and air-bag restraints, *Geier,* supra, does not alter the ruling enumerated in *Freightliner Corp. v. Myrick* (1995), 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385, which, as to ABS truck braking, held, as summarized in its headnotes:

{¶ 32} "Federal statute implicitly overrides state law either when scope of statute indicates that Congress intended federal law to occupy field exclusively, or when state law is in actual conflict with federal law.

{¶ 33} " 'Implied conflict' preemption may exist where it is impossible for private party to comply with both state and federal requirements, or where state law stands as obstacle to accomplishment and execution of full purposes and objectives of Congress."

{¶ 34} In the case sub judice, the issue of negligence is quite different as no federal regulations were in place at the time of manufacture of the trailer.

{¶ 35} 59 F.R. 18320–01 states:

{¶ 36} "This final rule does not have any retroactive effect. Under section 103(d) of the National Traffic and Motor Vehicle Safety Act (15 U.S.C. 1392(d)), whenever a Federal motor vehicle safety standard is in effect, a state may not adopt or maintain a safety standard applicable to the same aspect of performance which is not identical to the Federal standard. Section 105 of the Act (15 U.S.C. 1394) sets forth a procedure for judicial review of final rules establishing, amending or revoking Federal motor vehicle safety standards. That section does not require submission of a petition for reconsideration or other administrative proceedings before parties may file suit in court."

{¶ 37} Accordingly, any argument concerning retroactive application of the new amendments would be improper. The same can be said with respect to a retroactive preemption argument.

{¶ 38} In a case similar to the one at bar, a federal court found that lighting or reflective-tape requirements are not preempted by federal law.

{¶ 39} In *Peters v. Great Dane Trailers, Inc.* (Oct. 10, 1996), N.D.Ind. No. 4:94CV0068 AS, 1996 WL 698028, a plaintiff was injured when his car struck a flat-bed trailer. Plaintiffs claimed that the defendants were liable under theories of negligence and strict liability. Plaintiffs argued that reflective tape or lighting would have made it easier to see the trailer and avoid the crash. Great Dane maintained that the plaintiffs' claims of negligent or defective design and failure to warn were expressly and impliedly preempted by the National Traffic and Motor Safety Act of 1966, as amended, Section 1381 et seq., Title 15, U.S.Code (the "Safety Act") and a regulation implemented there under, Federal Motor Vehicle Safety Standard 108 ("Standard 108"), which regulates lamps, reflective devices, and associated equipment. Great Dane also maintained that the claims were impliedly preempted because the plaintiffs' state common-law claims would frustrate the purpose of and conflict with Standard 108 through juries mandating different lighting and reflecting requirements in the 50 states. Next, Great Dane contended that it could not be held liable to plaintiffs, because it offered

additional lights and reflectors, as well as retroreflective tape to Systems, but Systems chose not to purchase these items. Great Dane further argued that it could not be liable to the plaintiffs because it did not proximately cause their injuries.

{¶ 40} The court noted, "The trailer at issue in this case was manufactured in 1989 under Standard 108 which was in effect at that time, and it complied with the three light/three reflector requirements then in effect."

{¶ 41} After an exhaustive analysis the court concluded:

{¶ 42} "For these reasons, the court finds that the term 'standard' as used in the Safety Act's express pre-emption provision does not encompass state common law claims such as those asserted by the plaintiffs in this case. Therefore, the court is not persuaded that the Safety Act expresses an unambiguous congressional intent to pre-empt state common law claims such as the plaintiffs' claims. The court concludes that the Safety Act does not expressly pre-empt the plaintiffs' state common law claims."

{¶ 43} The court further considered whether common-law claims were impliedly preempted.

{¶ 44} Implied pre-emption can exist if (1) the scope of the statute indicates congressional intent to occupy the field exclusively or (2) state law is in actual conflict with federal law, which arises when (a) compliance with both state and federal requirements is impossible, or (b) state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Myrick*, 514 U.S. at 287, 115 S.Ct. 1483, 131 L.Ed.2d 385.

{¶ 45} The court found that the savings clause affirms congressional intent not to preempt all common-law claims through "field" preemption.

{¶ 46} Nor is there a conflict between state law and the federal regulation.

{¶ 47} "The equipment that the plaintiffs claim should have been installed on the trailer was not specifically listed in or required by Standard 108. Based on *Pokorny's* reasoning [*Pokorny v. Ford Motor Co.* (C.A.3, 1990), 902 F.2d 1116], the Safety Act would not pre-empt a claim for failure to install such additional equipment. Therefore, the court finds that if Great Dane is found liable under the plaintiffs' common law claims, no conflict with federal law would be created. *See, e.g., Wilson* [*v. Pleasant* (Ind.1995) ], 660 N.E.2d [327] at 337 (concluding that a state law would have to mandate a passive restraint system prohibited by federal regulation for a conflict between state law and federal law to exist); *Hernandez–Gomez* [*v. Leonardo* (1996), 185 Ariz. 509], 917 P.2d [238] at 246 (where plaintiff claimed that a manual lap belt should have been installed for protection in a rollover accident, the court concluded that no conflict existed

because the federal standard did not prohibit manual lap belts or other equipment for protection in rollover crashes)." *Peters*, 1996 WL 698028, at *17.

{¶ 48} Finally, the court noted:

{¶ 49} "The plaintiffs' claims do not conflict with Congress' chosen method for achieving its objective. In contrast to common law claims for failure to install air bags or automatic safety belts, the plaintiffs' claims here do not undermine a regulatory framework which included flexibility and choice as an 'essential element.' *Pokorny*, 902 F.2d at 1124. Instead, the plaintiffs' claims are like the claims asserted in *Pokorny* for failure to install a passive restraint system not specifically enumerated in Standard 208. Liability under the plaintiffs' claims would not actually conflict with the Safety Act or Standard 108. *See Pokorny*, 902 F.2d at 1126. Further, the plaintiffs' claims would serve to promote the installation of lighting equipment in addition to that required in Standard 108. One can hardly dispute that additional lighting equipment would provide greater illumination of the roadway and enhance the conspicuity of motor vehicles in furtherance of Congress' primary goal of safety. *See Buzzard v. Roadrunner Trucking, Inc.*, 966 F.2d 777, 785 (3d Cir.1992) ('Encouraging manufacturers to act in a way that increases safety does not frustrate the primary purpose of the Safety Act. Nor does it make it impossible to comply with both federal and state law, as it does not suggest that illuminated equipment mandated by state common law be used instead of that required by federal law, but only in addition to that specified in Standard 108'); *Pokorny*, 902 F.2d at 1126 (reasoning that common law claims for other design defects would serve to promote safety features in addition to those listed in Standard 208 was consistent with Congress' primary goal of safety); *Dancer v. Dorsey Trailer, Inc.*, Civ. A. No. 91–CV–3182, 1992 WL 76981, at *2 (E.D.Pa. Mar. 25, 1992) (finding no conflict between a common law claim for failure to install more reflectors and the federal standard's stated goal of enhanced visibility to prevent accidents); *Wilson*, 660 N.E.2d at 337 (discouraging manufacturers from utilizing a safety system which would be considered negligent under state common law would not undermine the congressional objectives of reducing traffic accidents and deaths and injuries to persons relating from traffic accidents). Therefore, the court finds that liability under the plaintiffs' state common law claims would not frustrate the objectives of Congress or the methods chosen to achieve those objectives." *Peters*, 1996 WL 698028, at *19.

{¶ 50} The issue of negligence in the manufacture of the trailer in the case at bar is for the jury. Again, 57 F.R. 58406–02 states:

{¶ 51} "On December 4, 1991, NHTSA published a notice of proposed rulemaking (NPRM) addressed to making large trailers more visible on the road (56 FR 63474). The NPRM represented a tentative and partial solution to a safety

problem that has concerned NHTSA for some years: The need to reduce the incidence and severity of collisions with large trailers during conditions of darkness or reduced visibility. As early as May 27, 1980, the agency showed its interest in enhanced conspicuity as a possible solution. NHTSA issued an ANPRM (45 FR 35405) requesting comments on methods to reduce such collisions by improving the conspicuity of large commercial vehicles. Forty-two comments were received, most of which favored the concept.

{¶ 52} "NHTSA Fleet Study:

{¶ 53} "Between 1980 and 1985, the agency conducted a fleet study in which retroreflective material was placed on truck-van trailer combinations in a manner designed to increase their conspicuity. The treatment of trailers consisted of outlining the rear perimeter, and delineating the lower side. No reflectorized mud flaps were used. The contractor concluded that truck-trailer combinations equipped with this material were involved in 15 percent fewer crashes (in which a trailer was struck in the side or rear) than combinations lacking the material.

{¶ 54} "1987 Request for Comments:

{¶ 55} "The agency published a Notice of Request for Comments on September 18, 1987 (52 FR 35345) concerning the use of reflective material to increase the conspicuity of large trucks and trailers. The Notice recited the results of the fleet study and sought comments on the test results as well as the experiences others may have had with the use of reflective material to enhance conspicuity. Thirty-seven comments were received, most agreeing that an effectiveness of 15 percent could be expected when all large vehicles were so equipped with reflective material.

{¶ 56} "The Motor Carrier Safety Act of 1990:

{¶ 57} "In response to the NHTSA fleet study, Congress included in the Motor Carrier Safety Act of 1990 (Sec. 15, Pub.L.101–500) a provision directing the Secretary of Transportation 'to initiate a rulemaking proceeding on the need to adopt methods for making trucks or any category of trucks more visible to motorists * * *' not later than February 3, 1991, and to complete the rulemaking proceeding not later than November 3, 1992.

{¶ 58} "The 1991 NPRM:

{¶ 59} "NHTSA regards its 1991 NPRM, which is part of a rulemaking proceeding begun before the enactment of the Motor Carrier Safety Act of 1990, as responsive to the directive in that Act, and this notice as the completion of the rulemaking proceeding mandated by Congress. Under the NPRM, heavy trailers would be required to be equipped with means for increasing their conspicuity because the agency tentatively concluded that this would be an effective method to reduce the incidence and severity of these crashes. The proposal did not apply

to large trucks without trailers, since NHTSA's FARS (Fatal Accident Reporting System) accident data for 1989 indicated a much lower rate of conspicuity-related accidents for large trucks alone than for large truck-trailer combinations. The reader is referred to the NPRM for a further discussion of the data.

{¶ 60} "Eighty-three comments were received in response to the NPRM, representing the views of manufacturers of vehicles, lamps, reflectors, and retroreflective sheeting; commercial and private fleet operators; the Teamsters union; States; insurance companies; and citizens. A Summary of Comments has been prepared and is available for inspection in the docket. Details of the NPRM, issues raised by the comments, and NHTSA's responses are discussed below. NHTSA has incorporated recommendations on modifications to the proposed retroreflective brightness values in a Supplementary Notice of Proposed Rulemaking (SNPRM) that is being prepared for publication. The SNPRM will also incorporate proposals regarding substitution of the retroreflective materials required by this notice for existing reflex reflectors.

{¶ 61} "Effectiveness of Conspicuity Treatment:

{¶ 62} "There was near unanimity among the commenters that a retroreflective conspicuity treatment would prevent accidents and save lives. Most of the comments were directed towards the details of implementing conspicuity treatment rather than questioning its efficacy. The only commenter who questioned the possible effectiveness was UPS, principally because neither it nor its insurers were aware of any data concerning conspicuity-related accidents."

{¶ 63} Clearly, enough of a factual issue exists concerning appellee's knowledge of the dangers and of possible solutions to overcome a motion for summary judgment.

{¶ 64} We therefore differ with the trial court and hold that such subsequent regulations did not preempt state common-law actions relative to the installation of conspicuity tape.

{¶ 65} It therefore becomes a jury question as to whether the 40–year knowledge in the trucking industry, if established, was of such an extent that failure to install retroreflective tape constituted negligence, if such absence was the proximate cause of appellant's injuries.

{¶ 66} We therefore sustain the assignment of error and remand this cause for further proceedings in accordance herewith.

{¶ 67} We decline to address the similar questions of the lack of underride protection, strict liability, or punitive damages as these were clearly not addressed by the trial court.

{¶ 68} The summary judgment ruling of the trial court is vacated, and the judgment is reversed at appellee's costs.

Judgment reversed.

W. Scott Gwin and Edwards, JJ., concur.