942 F.2d 842
 60 USLW 2145, 34 Soc.Sec.Rep.Ser. 550,
Medicare & Medicaid Guide P 39,577, 2 NDLR P 60
 PENNSYLVANIA MEDICAL SOCIETY, American Medical Association,
Crawford County Medical Society and Robert N. Moyers, M.D.,
v.
Joseph MARCONIS, M.D., Shirley F. Fox, R.N., James A. Kane,
M.D., Guy L. Kratzer, M.D., Gary W. Lyons, M.D., Joshua A.
Perper, M.D., Mark N. Richards, M.D., George L. Shevlin,
Barbara K. Shore, Ph.D., Jason C. Shu, M.D. and Mary Ellen Weinberg.
Pennsylvania Medical Society, American Medical Association,
Crawford County Medical Society and Robert N.
Moyers, M.D., Appellants.
 No. 91-3085.
 United States Court of Appeals,
Third Circuit.
 Argued July 15, 1991.
Decided Aug. 26, 1991.
 
 Jack R. Bierig (argued), David F. Graham, James C. Dechene, Richard D. Raskin, Sidley & Austin, Chicago, Ill., Robert B. Hoffman, Reed Smith Shaw & McClay, Harrisburg, Pa. (Kirk B. Johnson, Edward B. Hirshfeld, Michael L. Ile, Chicago, Ill., and Kenneth B. Jones, Elizabeth B. Metz, Pennsylvania Medical Soc., Harrisburg, Pa., of counsel), for appellants.
 Ernest D. Preate, Jr., Atty. Gen., Susan J. Forney (argued), Calvin R. Koons, Sr. Deputy Attys. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Harrisburg, Pa., for appellees.
 Alison E. Hirschel, Philadelphia, Pa., Richard P. Weishaupt, Lisa M. Day, Philadelphia, Pa., for amici curiae Donald English, Sarah Philyaw, Helena White and Action Alliance of Senior Citizens of Greater Philadelphia.
 Alfred J. Chiplin, Jr., National Senior Citizens Law Center, Washington, D.C., Bess M. Brewer, National Senior Citizens Law Center, Los Angeles, Cal., Steven Zaleznick, Cheryl Matheis, American Ass'n of Retired Persons, Washington, D.C., Michael J. Campbell, Pennsylvania Health Law Project, Chester, Pa., for amici curiae Gray Panthers Advocacy Committee and The American Ass'n of Retired Persons.
 Gregory H. Knight, Hetrick, Zaleski, Ernico & Pierce, P.C., Harrisburg, Pa., for amicus curiae Pennsylvania Optometric Ass'n.
 Before SLOVITER, Chief Judge, and GREENBERG and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 This case involves a constitutional challenge to the Pennsylvania Health Care Practitioners Medicare Fee Control Act which regulates certain billing practices of physicians treating Medicare patients. The appellants contend that the Fee Control Act is invalid under the Supremacy Clause of the United States Constitution, art. VI, cl. 2, because it is preempted by the federal Medicare Act.[1] The district court found that the appellants had failed to prove congressional intent to preempt the Fee Control Act and granted summary judgment for the appellees. We will affirm that order.
 
 I.
 BACKGROUND
 The Medicare Program
 
 2
 Medicare is the federal insurance program to pay for medical care of persons 65 and older. See 42 U.S.C.A. § 1395 et seq. (West 1983 & West Supp.1991). It is composed of two main parts, Part A which covers hospitalization and institutional charges, and is not implicated in this case, and Part B. Id. at §§ 1395c-1395i-2. Part B establishes an insurance program to pay for physicians' services. Id. at §§ 1395j-1395w. Benefits under Part B are administered by local insurance carriers under the supervision of the United States Department of Health and Human Services. Id. at § 1395u. Medicare is funded by the federal government without state administrative or financial participation.
 
 
 3
 While benefits are paid on a fee-for-service basis, the "fee" that Medicare pays is not necessarily that charged by the physician, for Medicare has established a "reasonable charge"[2] for each procedure. Beneficiaries are covered for 80% of Part B costs, but Medicare pays no more than 80% of the reasonable charge regardless of what the doctor actually charges. Id. at § 1395l (a)(1). Beneficiaries are responsible for the remaining 20% as a co-payment.
 
 
 4
 Physicians have two payment options under Part B. They can "accept assignment" which means that they bill Medicare directly and accept the reasonable charge as full payment for their services in which event they receive 80% from Medicare and 20% from the patient. Id. at § 1395u(b)(3)(B)(ii). One advantage of "accepting assignment" is that Medicare guarantees prompt payment of the 80%. Alternatively, physicians can charge "on the basis of an itemized bill" and not be bound by the Medicare reasonable charge. Id. at § 1395u(b)(3)(B)(i). A physician using this option bills the patient for 100% of the charge directly, with Medicare reimbursing the patient for 80% of the reasonable charge. Billing in excess of the allowable reasonable charge is "balance billing."
 
 
 5
 In recent years, Congress has encouraged physicians to accept assignment rather than balance bill. The Deficit Reduction Act of 1984 (DEFRA) created the "Participating Physicians Program" under which physicians decide annually whether to enter into a "participation agreement." A participating physician agrees to accept assignment for all items and services furnished to Medicare patients under Part B and is precluded from balance billing during the term of the participation agreement. See 42 U.S.C.A. § 1395u(h)(1) (West Supp.1991). A non-participating physician can accept assignment in an individual case or balance bill. DEFRA also temporarily froze the fees that non-participating physicians could charge Medicare patients. See AMA v. Bowen, 857 F.2d 267, 268 (5th Cir.1988).
 
 
 6
 DEFRA provided incentives for physicians to accept assignment. Whitney v. Heckler, 780 F.2d 963, 967 (11th Cir.), cert. denied, 479 U.S. 813, 107 S.Ct. 65, 93 L.Ed.2d 23 (1986). Among other incentives, participating physicians could receive a 5% increase over the charge allowable for a non-participating physician. See 42 U.S.C.A. § 1395u(b)(4)(A)(iv) (West Supp.1991). In addition, participating physicians are listed in an annual directory published by Medicare and made available to beneficiaries. Id. at § 1395u(h)(4)-(6). See also Whitney v. Heckler, 780 F.2d at 970-72.
 
 
 7
 The Omnibus Budget Reconciliation Act of 1986 (OBRA '86) lifted the DEFRA freeze and substituted a system of "maximum allowable actual charges" (MAACs) as a new form of "price control for non-participating doctors." AMA v. Bowen, 857 F.2d at 268-69. MAACs placed an across-the-board limit on the amount non-participating physicians could charge (balance bill) Medicare beneficiaries. See 42 U.S.C.A. § 1395u(j)(1)(C) (West Supp.1991). Significantly, OBRA '86 also established the Physician Payment Review Commission (PPRC) as an advisory body to Congress to submit annual recommendations for rates and methods of payment for services under Medicare Part B. Id. at §§ 1395w-1(a) and (b)(1).
 
 
 8
 The PPRC has never recommended that balance billing be banned. In its 1988 and 1989 annual reports, the PPRC characterized balance billing as a possible "safety valve" against the reduction of access to medical care for Medicare beneficiaries. See PPRC, 1988 Annual Report to Congress 173; PPRC, 1989 Annual Report to Congress 137. In its 1989 report, the PPRC recommended that a national fee schedule be substituted for the existing reasonable charge program and recommended that charges for unassigned claims (i.e., balance billing charges) should be limited to a fixed percentage of the fee schedule amount, a limit which would replace MAACs. The Report stated that the PPRC
 
 
 9
 advocates limits on charges for the same reason that it advocates a fee schedule based primarily on resource costs. The reason is that the market for physicians' services does not function well enough to provide financial protection for Medicare beneficiaries. The PPRC Survey of Beneficiaries found that balance bills fall on low-income beneficiaries as well as those better able to pay them. On the other hand, the Commission does not recommend mandatory assignment at this time. Mandatory assignment would be unacceptable to many physicians and inconsistent with the Commission's goal of orderly change.
 
 
 10
 PPRC, 1989 Annual Report to Congress xxiii (footnote omitted) [Emphasis added].
 
 
 11
 Based on PPRC reports, Congress set three additional constraints on balance billing in the Omnibus Budget Reconciliation Act of 1989 (OBRA '89). It banned balance billing of persons eligible for both Medicare and Medicaid and thus, when treating the elderly poor, a treating physician must accept assignment. See 42 U.S.C.A. § 1395w-4(g)(3) (West Supp.1991). Second, Congress imposed caps on balance billing for certain procedures and limited balance billing to 125% of the allowable charge. Id. at §§ 1395u(j)(1)(D); 1395u(b)(14)(A). Third, Congress replaced MAACs with "limiting charges" (LCs). Beginning on January 1, 1991, non-participating physicians may balance bill only up to the LC. The LC is no more than 25% above the allowable charge in 1991, 20% in 1992, and 15% in 1993 and afterward. Id. at § 1395w-4(g)(1-2).[3] The limiting charges place a cap on balance billing applicable to all Medicare beneficiaries and all medical services covered by Medicare.
 
 
 12
 The Pennsylvania Health Care Practitioners Medicare Fee Control Act
 
 
 13
 Against this backdrop of federal legislation, Pennsylvania enacted the Health Care Practitioners Medicare Fee Control Act on July 10, 1990, effective on September 8, 1990. See Pa.Stat.Ann. tit. 35, § 449.31 et seq. (Purdon Supp.1991). The Fee Control Act provides that it is "unlawful" for "any health care practitioner ... to balance bill," id. at § 449.34, which is defined as charging Medicare patients "an amount in excess of the reasonable charge for the service provided, as determined by the United States Secretary of Health and Human Services." Id. at § 449.33. The act provides that the prohibition is intended to address a "continuing escalation of costs for health care services" that results in "limited access to appropriate and timely health care" and "undermin[es] the quality of health care services currently being provided." Id. at § 449.32. The act instructs the Pennsylvania State Board of Medicine to penalize physicians who balance bill in violation of the act's provisions. The appellees are the individual members of that board.
 
 II.
 THE HISTORY OF THIS CASE
 
 14
 The appellants, national, state and local medical associations and an individual physician who provides services to Medicare beneficiaries, filed suit against the appellees in the United States District Court for the Western District of Pennsylvania, alleging that the Fee Control Act violated the Supremacy Clause of the Constitution. In particular, the appellants claimed that the law impermissibly regulated an area exclusively governed by the federal Medicare Act and directly conflicted with the intent of Congress as expressed in the Medicare Act.
 
 
 15
 Following the filing of the appellees' answer, the parties made cross motions for summary judgment, the issue presented to the court being whether the federal Medicare legislation preempted state laws banning balance billing. The parties stipulated that there were no issues of material fact in dispute, making this case appropriate for resolution by summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The district court, in a memorandum opinion and accompanying order entered January 30, 1991, denied appellants' motion and granted that of the appellees. Pennsylvania Medical Society v. Marconis, 755 F.Supp. 1305 (W.D.Pa.1991). This appeal followed. The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and we have jurisdiction pursuant to 28 U.S.C. § 1291. The question of preemption involves an issue of law and our review of the district court's decision is plenary. Pokorny v. Ford Motor Co., 902 F.2d 1116, 1119 (3d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 147, 112 L.Ed.2d 113 (1990).
 
 
 16
 The appellants concede that the Medicare Act does not explicitly preempt the Fee Control Act but contend the Fee Control Act is impliedly preempted because: (1) the federal Medicare program is sufficiently comprehensive to compel the inference that Congress intended to occupy the field of Medicare billing practices; and (2) the Fee Control Act is an obstacle to the accomplishment of the full goals and objectives of the federal legislation. The district court rejected both of these preemption arguments and, as we do as well, we will affirm.
 
 III.
 THE INITIAL PRESUMPTION
 
 17
 Before addressing the two alleged bases of preemption, we first consider whether we should analyze the preemption issue, as did the district court, from an initial assumption that the Fee Control Act was within state power. We face this issue because when Congress regulates in a field historically within the police powers of the states, the party arguing preemption bears a heavy burden of proving that preemption was the "clear and manifest purpose of Congress." Pacific Gas & Elec. v. State Energy Resources Comm'n, 461 U.S. 190, 206, 103 S.Ct. 1713, 1723, 75 L.Ed.2d 752 (1983). This assumption arises from the related presumption that Congress does not normally intend to displace state law. Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981).
 
 
 18
 The district court found that the Fee Control Act is concerned with a matter traditionally within the police powers of the state--that is, the regulation of public health, including medical care costs. 755 F.Supp. at 1308 (citing Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985); Great Atlantic and Pacific Tea Co v. Cottrell, 424 U.S. 366, 371, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976) (other citations omitted)).[4] The court stated that as Congress acted in a field traditionally regulated by the states, "the challenged law is constitutional unless [appellants] prove that Congress has shown a clear intent to displace it." At 1309.
 
 
 19
 The appellants contend that the district court erred in presuming the Fee Control Act to be a valid exercise of the state's traditional police powers. They concede that state laws regulating areas traditionally occupied by the states are presumed constitutionally valid. See, e.g., Massachusetts Medical Society v. Dukakis, 815 F.2d 790, 791 (1st Cir.), cert. denied, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987) (the field of medical fee regulation seems by tradition to be one of state concern). However, they urge that this presumption exists only for neutral state laws of general application so that a state law directly targeting a federal statutory program, and which could not exist without that program, is not a neutral statute of general application and is not entitled to the presumption of validity. The appellants contend that the Fee Control Act is such a directly targeted law since its viability derives from and is inextricably linked to the federal Medicare Act. Without the Medicare Act, the Fee Control Act would not exist.
 
 
 20
 The appellants rely on the Supreme Court's decision in Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988), in support of this position. Schneidewind involved a challenge by several natural gas companies to a Michigan law requiring them to obtain state regulatory approval before issuing long-term securities. The state argued that the law was a traditional securities law with only indirect effects on the federal program under which the controlling agency, the Federal Energy Regulatory Commission (FERC), had substantial powers and obligations over gas companies, although FERC was not expressly authorized to regulate the issuance of securities.
 
 
 21
 The Court rejected the state's argument as it found that federal legislation preempted state laws requiring pre-issuance approval for securities issued by gas companies. The Court stated that the federal legislation, the Natural Gas Act, had long been recognized as a "comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.' " Id. at 300, 108 S.Ct. at 1151 (citation omitted). The field of matters relating to wholesale sales and transport of natural gas in interstate commerce had been occupied by federal legislation. Id. at 305, 108 S.Ct. at 1153. The federal scheme preempted any state legislation regulating rates and facilities of natural gas companies used in transportation and sale for resale of natural gas in interstate commerce. The Court found that the Michigan statute was such a regulation of rates and facilities and was therefore preempted. Id. at 306, 108 S.Ct. at 1154.
 
 
 22
 The Court noted that not every state statute having some indirect effect on rates and facilities of natural gas companies would be preempted, but the effect of the state statute involved was not indirect. Rather, it had as its "central purpose ... to regulate matters that Congress intended FERC to regulate." Id. at 309, 108 S.Ct. at 1155. [Emphasis added.] The Court noted that although the federal statute did not expressly grant the FERC pre-issuance authority over gas company securities, the express rights provided to the agency achieved the same ends. Id. at 309, 108 S.Ct. at 1155-56.
 
 
 23
 The appellants' reliance on Schneidewind is misplaced because Congress intended to preempt state regulation of rates and facilities of natural gas companies and it was clear that the Natural Gas Act was intended by Congress to occupy this field. Accordingly, the issue was not whether Congress intended to preempt state regulation in the occupied area. Rather, it was whether the state statute amounted to such regulation. Id. at 308, 108 S.Ct. at 1154.
 
 
 24
 In this case, congressional intent is the issue in dispute. We must determine whether Congress intended to preempt a state ban on balance billing. While the non-neutral statute at issue in Schneidewind was not entitled to the presumption of validity it was because congressional intent otherwise was clear. No such clarity exists here. The licensing and regulation of physicians is a state function. See, e.g., Massachusetts Medical, 815 F.2d at 791. Appellants have failed to prove otherwise. Thus, the state regulation is presumed valid. To rebut this presumption, appellants must show that Congress intended to displace the state's police power function. Appellants seek to avoid this burden of proof by imposing a condition on the presumption. Appellants would have the police powers presumption be proven legitimate before they are required to rebut it. This begs the question and incorrectly shifts the burden of proof. It is up to appellants to prove the presumption invalid, either by showing the area regulated is not in an area of traditional state regulation or by showing that Congress intended to displace this function. Until they do so, the presumption remains. Appellants cannot avoid their burden of proof by artificially narrowing the definition of the state police function specifically to exclude the regulation at issue here. See Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) ("[w]here, as here, the field which Congress is said to have pre-empted has been traditionally occupied by the States ... 'we start with the assumption that the historic police powers of the State were not superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress'.").
 
 
 25
 The appellants' reliance on other cases for the proposition that the presumption of validity is inapplicable here is similarly misplaced, for the cases simply stand for the unexceptional point that in the face of a demonstration of a congressional intent to preempt, a state law will be invalidated. This proposition is certainly not inconsistent with the principle that it is presumed that a state law within a traditional state regulatory field is not preempted. Thus, in Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1112-13 (3d Cir.1985), cert. denied, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986), a local ordinance prohibiting the importation of nuclear waste for storage purposes was preempted by a federal regulation, since congressional intent to regulate the safety aspects of the nuclear industry was established and the local ordinance was actually a regulation of that character. In Felder v. Casey, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), a Wisconsin notice of claim statute could not be applied to actions under 42 U.S.C. § 1983 against state or local governmental entities or officers in state court, as section 1983 was intended to provide a federally-created remedy and the state notice of claim requirement could bar recovery in section 1983 actions, and thereby present an obstacle to the accomplishment of the goals of Congress in enacting section 1983. In Mackey v. Lanier Collections Agency & Service Inc., 486 U.S. 825, 830, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988), a Georgia statute bearing on the garnishment of funds due to participants in ERISA employee welfare plans was a state law relating to an employee benefit plan and was therefore specifically preempted by ERISA which provides that it preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA.
 
 IV.
 THE APPELLANTS' SUBSTANTIVE ARGUMENTS
 
 26
 With the presumption of the Fee Control Act's validity in place, we consider the two bases for preemption urged by the appellants, our "sole task" being to discern congressional intent. California Fed. Savings & Loan Ass'n v. Guerra, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). In the absence of an explicit preemption provision, Congress's intent to preempt can nonetheless be inferred and Congress may implicitly indicate that intent in two ways. First, it may indicate an intent to occupy a given field to the exclusion of state law where the pervasiveness of the federal regulation precludes supplementation by the states. Second, even where Congress has not entirely displaced state regulation in a particular field, state law is preempted when it actually conflicts with federal law. A conflict exists when it is impossible to comply with both state and federal law, or if the state law is an obstacle to the accomplishment of the full purposes and objectives of Congress in enacting the federal legislation. Schneidewind v. ANR Pipeline Co., 485 U.S. at 300, 108 S.Ct. at 1150-51. See also Wisconsin Public Intervenor v. Mortier, --- U.S. ----, 111 S.Ct. 2476, 2481-82, 115 L.Ed.2d 532 (1991). An obstacle can be found when the state statute interferes with the methods chosen for the federal legislation to reach its goals. Pokorny v. Ford, 902 F.2d at 1123.[5]V.
 
 
 27
 OCCUPATION OF THE FIELD AND CONFLICT WITH THE MEDICARE PROGRAM
 
 
 28
 The appellants argue that Congress has implicitly indicated its intention to occupy the field of Medicare billing practices through its extensive medicare regulations, and that the Fee Control Act is an obstacle to the accomplishment of the goals for the Medicare program. We consider both arguments but find that the appellants have not carried their burden to prove congressional intent to preempt under either argument.
 
 
 29
 Occupation of the Field of Medicare Billing Practices
 
 
 30
 The federal Medicare statute is an extraordinarily complex piece of legislation subject to constant review and modification. In recent years, as an aspect of this process, Congress has dealt in intimate fashion with balance billing but has not provided explicitly for preemption of state regulation in the field.
 
 
 31
 The parties consider this complexity and urge that we draw different inferences from it. The appellants contend that the congressional intent to be inferred from the complexity of the statute, specifically the provisions involving balance billing, is that the federal legislation is exclusive. Specifically, they urge us to find that Congress intended to allow for balance billing, an intention frustrated by the Fee Control Act. The appellees argue, and the district court agreed, that the appellants failed to prove this intent, thereby supporting the conclusion that Congress did not intend to preempt state action regarding billing practices. The appellees maintain that the intent to be inferred from the complexity of the Medicare program, which lacks a specific preemption provision, is that Congress did not intend to prevent state legislation banning balance billing.
 
 
 32
 The district court concluded that the appellants had failed to prove by clear and manifest evidence that the occupation of the field doctrine supported preemption. The court rejected their argument that the complexity of the Medicare Act indicated congressional intent to preempt state legislation of billing practices, finding the contrary inference more persuasive. That is, it found that the notable absence of an explicit preemption provision in the intricate and complex regulatory scheme indicated that Congress did not intend to displace state law entirely. 755 F.Supp. at 1309 (citing Ford Motor Co. v. Insurance Comm'r of Pennsylvania, 874 F.2d 926, 939 (3d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 418, 107 L.Ed.2d 382 (1989)).
 
 
 33
 The district court thought the absence of a preemptive provision was particularly instructive. By no later than 1989, Congress was aware of state statutes in existence or being considered which banned or limited balance billing. Though Congress considered these laws, it did not enact any explicit preemption provision. Although the district court noted that congressional silence is normally a "bad barometer" of congressional intent, it found that approach inapplicable here, since Congress was undoubtedly aware of and considered the existence of possible conflicting state laws, and yet did not explicitly provide for their preemption. At 1309-11.
 
 
 34
 The district court noted that Congress's own administrative body, the PPRC, included an entire appendix in its 1989 report regarding state prohibitions on balance billing. In addition, the General Accounting Office issued a report to Congress surveying the costs and benefits of state balance billing practices. The court noted that, "[b]y so thoroughly analyzing state-level reaction to medicare, it appears that Congress approve[d] of a geographical fine tuning." At 1310. However, the court noted that it did not need actually to decide congressional intent on this issue since the appellants had failed to provide clear and manifest evidence of congressional intent to prevent such fine tuning. Id.
 
 
 35
 The appellants argue that this conclusion was erroneous and that Congress intended to occupy the field of Medicare reimbursement and billing, manifesting its intent in two ways. First, the appellants claim that the size of the Medicare program, particularly the vast sums spent on it each year and the fact that the program is administered exclusively by the Department of Health and Human Services and selected insurance carriers, reveals congressional intent to occupy the field. Second, the appellants argue that by enacting a pervasive and complex scheme for regulating balance billing, Congress "left no room" for state legislation in this area. They claim that the recent amendments to the Medicare statute involving balance billing reveal that Congress intended that it, not the states, perform any fine tuning to the billing procedures.
 
 
 36
 Thus, the appellants urge that the district court erred by giving greater weight to congressional inaction regarding a preemption provision than to the detailed and comprehensive Medicare provisions it did enact. They argue that the complexity and detail of the federal statute show that Congress intended to allow balance billing and, by implication, to prevent a state from banning it. In the same vein, the appellants assert that the district court erred by finding that the complexity of the Medicare statute, sans a preemption provision, supported the notion that Congress did not intend to preclude state actions banning balance billing.
 
 
 37
 We are not convinced by the appellants' arguments. Rather, we find the reasoning of the district court more persuasive. First, the fact that Congress appropriates large sums of money to the Medicare program is not proof of congressional intent to preempt. Congress appropriates large sums of money to many programs, yet does not necessarily intend to preempt state action in the areas involved. For example, Congress appropriates large sums for highway construction but traffic regulations are for the most part state matters.
 
 
 38
 Second, although the complexity of the Medicare program might, in some circumstances, support the inference that Congress intended its regulation of Medicare physician billing practices to be exclusive, we are dealing with an unusual situation. The appellants cannot overcome the fact that, at the time of the Medicare amendments in 1989, and since then, Congress was and has been undisputedly aware of the fact that at least four states had balance billing restriction statutes and that similar restrictions had been considered by some 18 states. At 1310-11. This information was included in the PPRC report submitted to Congress in 1989. But in the face of this information, Congress did not include a specific preemption provision in the 1989 amendments to Medicare, nor has it done so since. The Supreme Court in a precedent we are not free to disregard has noted that when Congress remains silent regarding the preemptive effect of its legislation on state laws it knows to be in existence at the time of such legislation's passing, Congress has failed to evince the requisite clear and manifest purpose to supersede those state laws. California Fed. Savings & Loan Ass'n v. Guerra, 479 U.S. at 287-88, 107 S.Ct. at 693. Furthermore, in this case the silence is particularly indicative of congressional intent, given the extraordinary oversight of the Medicare program as evidenced by the very existence of the PPRC with its annual reports to Congress and by the frequent amendment of the Medicare Act. Congress has simply not preempted state balance billing restrictions.
 
 
 39
 It is important to note that in 1985 Massachusetts enacted a law that prohibited balance billing and made the refusal to balance bill a condition for licensure. The law was challenged on preemption grounds but the district court found it was not preempted and its order was affirmed. Massachusetts Medical Society v. Dukakis, 637 F.Supp. 684 (D.Mass.1986), aff'd, 815 F.2d 790 (1st Cir.), cert. denied, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). While the district court in this case thought that Massachusetts Medical was not particularly helpful to its analysis because of the numerous changes made in Medicare legislation since the time of the decision, we believe that the case is worthy of note for the reasons discussed above. Congress was aware of the existence of state laws restricting balance billing and of the Massachusetts Medical case, yet remained silent as to preemption in subsequent Medicare amendments, an acquiescence which if not compelling an inference that Congress did not intend to preclude such state regulation, at least strongly supports it. Surely if Congress intended to occupy the field it would have expelled the state intruders.
 
 
 40
 We note that one statement in the House Ways and Means Committee Report incorporated into the House Budget Committee Report accompanying the House version of OBRA '89 seems to be a direct reference to Massachusetts Medical. The House Report states that "[t]he Committee intends that nothing in this section would prejudice the right of any State to require assignment on Medicare claims as a condition of licensure in the State." H.R.Rep. No. 247, 101st Cong., 1st Sess., at 1008, reprinted in 1989 U.S.Code Cong. & Admin.News 1906, 2479. The district court discounted the importance of this statement in its decision, since it was not known whether the statement was approved by the committee or inserted by a congressional staff member. At 1310 n. 7.
 
 
 41
 We believe that this statement warrants more import than the district court gave it. The 1988 and 1989 PPRC Reports to Congress and the 1989 GAO Report noted the existence of state laws banning balance billing and the GAO Report noted the legal challenge to the Massachusetts law. This Massachusetts law specifically required a physician to accept assignment as a licensing requirement. It seems that the statement that the amendments were not meant to "prejudice the right of any state to require assignment on Medicare claims as a condition of licensure in the State" must have been referring to the Massachusetts law. As such, this is the only legislative statement of which we are aware clearly indicating congressional intent regarding preemption and it strongly indicates that preemption was not intended.
 
 
 42
 Finally, the very complexity of the Medicare legislation, absent an exclusive preemption provision, is further support for the conclusion that Congress did not intend to preempt state legislation on balance billing by occupying the field. In Ford Motor Co. v. Insurance Comm'r, we observed that the comprehensive nature of a federal regulatory scheme, by itself, is not sufficient to support the conclusion that Congress intended to preempt all state regulation. 874 F.2d at 939. We further noted that "precisely because the regulatory scheme at issue ... is so detailed, we interpret the absence of preemptive language as indicative that Congress did not intend to displace state law entirely." Id.[6]
 
 
 43
 We conclude that the appellants failed to establish clear congressional intent to occupy the field of Medicare billing procedures. Therefore, we find no error by the district court in rejecting this argument.
 
 Obstacle to the Goals of Medicare
 
 44
 Next, we consider the appellants' argument that the Fee Control Act interferes with the accomplishment of the purposes and objectives of Medicare. In the district court, the appellants argued two possible bases for this conflict. First, they contended that the Medicare statute established balance billing as an option designed to help achieve a balance between maintaining lower medical costs and access to medical care which the Fee Control Act negated and second, that the Fee Control Act conflicted with the Medicare requirement that physicians participate voluntarily. The court rejected both arguments.
 
 
 45
 In rejecting the appellants' argument that state bans on balance billing would upset the balance fostered by the Medicare Act between cost containment of and access to medical treatment, the district court stated that simply because Congress had a design to strike a particular balance it did not shut states out of the process. At 1312. The court found that the appellants failed to meet their burden to prove the need or intent that the particular balance be nationally uniform. Id. at 1312. The court indicated that congressional intent for national uniformity and the intent to preclude state involvement must be explicit to support preemption. The court did not find a convincing argument for national uniformity, noting again that the regulation of health care is a state function and that a state could regulate the payments for medical services without affecting other doctors, patients or states. In fact, the court set forth its belief that states might be more equipped to deal with the payment issue and to fine tune the federal legislation. The states would be better informed regarding local factors which could affect determinations regarding costs. Id. at 1313.
 
 
 46
 Finally, the district court rejected the argument that the Fee Control Act negated Medicare's provision that physicians voluntarily agree to participate in the program. The court found no merit in this argument because it concluded that the term "voluntary" referred to voluntariness from the federal perspective. The voluntary provision meant that no federal law, that is no other Medicare provision, could coerce a physician into participation. Thus, the argument was rejected vis-a-vis any impact it might have on physicians from the state's perspective. Id. at 1313.
 
 
 47
 The appellants contend that the district court erred in rejecting the argument that Congress intended to preclude state action banning balance billing because such state statutes would be an obstacle to the goals of Congress for the Medicare program. The appellants argue that these goals include accommodating the dual objectives of controlling costs and maintaining access to services. They contend that the balance billing option, particularly as currently regulated, serves to maintain access to services. Simply put, without the balance billing option, more physicians might refuse to treat Medicare patients, thus reducing their access to qualified medical care. The appellants urge that the federal regulatory program, in which balance billing has been maintained as a billing option, supports the conclusion that Congress intended to allow balance billing and that balance billing is an "integral part" of Medicare. The appellants say that the Fee Control Act negates the congressional decision that balance billing serves the purposes of the Medicare program and, in addition, interferes with the methods chosen by Congress to achieve those purposes which methods include balance billing.[7]
 
 
 48
 Whereas the appellants see the Medicare legislation, particularly those provisions involving balance billing, as a statement by Congress that balance billing is an integral part of the Medicare program, the appellees urge that the recent amendments merely indicate that balance billing is the status quo, not a federally protected right, and that nothing in the statute or legislative history indicates that Congress intended to prevent states from altering the status quo. The appellees deny that a ban on balance billing obstructs congressional intent for Medicare or that it interferes with the chosen methods of congressional goals for Medicare. In fact, the appellees urge, and the district court agreed, that state legislation in this area might be a benefit to the federal program, rather than a hindrance.
 
 
 49
 Undoubtedly, the appellants make a substantial "interference" argument. The fact that the federal legislation does allow balance billing and Congress did not eliminate it when it amended Medicare supports the appellants' argument. Although there is no direct conflict between the state and federal laws, in that a physician need not violate federal law to obey state law, or vice versa, Pennsylvania has arguably made treatment of Medicare patients less desirable to physicians by imposing the ban on balance billing. Accepting that one of the objectives of the Medicare program is to encourage physicians to treat Medicare patients, the Pennsylvania ban could be viewed as an "interference" with this objective and with the methods chosen to achieve that goal.
 
 
 50
 Thus, it is contended that what Congress has given, the Fee Control Act has taken away. If, in fact, balance billing is a guaranteed option under Medicare, and is an integral part of it, the Fee Control Act would interfere with the federal program by removing the balance billing option for any physician treating Medicare patients in Pennsylvania.
 
 
 51
 We conclude, however, that appellants have failed to show that the Fee Control Act is an obstacle to the goals of the Medicare program as this argument is based on speculation regarding the possible consequences of balance billing bans to the quality of and access to medical care. Further, appellants' obstacle argument assumes that Congress intended to protect balance billing from state supplementation as one of the goals of the Medicare program. Appellants have failed to establish this intent by clear and manifest evidence. As a consequence, appellants' assumption is wrong and their obstacle argument fails.
 
 
 52
 Appellants argue that the Fee Control Act interferes with Medicare's goal of guaranteeing access to qualified medical care. However, this argument reflects pure conjecture as to the effects of balance billing bans. It is sheer speculation to suggest that a ban on balance billing will significantly reduce access to physicians' services. While undoubtedly some physicians do refuse to accept assignment when balance billing is available, only time will tell if they will continue to do so when it is not, for if they do, they will renounce a large share of the market for their services. Of course, if a problem actually develops, Congress can address it at that time with the benefit of information from its annual PPRC reports. See Wisconsin Public Intervenor, 111 S.Ct. at 2487 (if Congress finds that the local regulation wreaks the havoc about which challengers speculate, Congress is free to enact legislation to prevent this havoc). In the interim, it appears that the appellants' arguments, though cast in public interest terms, are essentially and simply an understandable, and in a supposedly free market economy, reasonable attempt to protect their fee structure.[8] But whatever the views of this court on that subject might be, decisions regarding the wisdom of restrictions on balance billing are not ours to make and are not even implicated in this case.
 
 
 53
 Equally unconvincing is appellants' claim, urged on this court at oral argument, that balance billing bans will result in increased federal expenditures, thereby presenting an obstacle to the Medicare program. Simply put, appellants argue that with balance billing bans in place, Medicare beneficiaries will seek covered services more often because the services will be done solely on an assignment basis, thereby requiring less out-of-pocket expenditures on their part. This, in turn, will increase the cost of Medicare to the federal government because the government pays for 80% of the cost of these services. Appellants do not point to any place in the record to support these sweeping predictions. Therefore, we reject this argument as speculative.
 
 
 54
 The appellants, in an attempt to refute the conclusion that the Fee Control Act does not obstruct the purposes of the federal Medicare Act, rely on our decision in Pokorny v. Ford Motor Co., 902 F.2d 1116. In Pokorny, we found that the federal National Traffic and Motor Vehicle Safety Act ("Safety Act") and the federal regulations related thereto, specifically the Federal Motor Vehicle Safety Standard 208, impliedly preempted a Pennsylvania common law action in a products liability suit brought by reason of the failure of the manufacturer to include either automatic restraints or air bags in a vehicle. Although we found implicit preemption, we rejected the argument that the statute expressly provided for preemption. We also rejected the argument that the plaintiff's suit was barred by preemption because of a congressional concern with national uniformity in motor vehicle safety requirements. We noted that congressional intent in enacting the Safety Act was to reduce traffic accidents and deaths, and that national uniformity was not a primary congressional goal for the act. Therefore, we refrained from analyzing the preemption issue based on a national uniformity theory and took the more cautious approach of analyzing preemption in terms of whether the state law presented an actual conflict with the federal statute. Id. at 1122-23.
 
 
 55
 In Pokorny, the plaintiff was the administratrix of decedent's estate. The decedent was killed when a Ford van in which he was a passenger was involved in an accident. The van was equipped with manual seat belts which the decedent was not wearing. The plaintiff's suit sought recovery on the theory that the van was defectively designed because it was not equipped with air bags or automatic restraints. The plaintiff also claimed it was defective because it was not equipped with protective window netting.
 
 
 56
 We upheld the district court's conclusion that federal law and regulations preempted the Pennsylvania common law of product liability to the extent that it imposed liability for failure to equip the van with air bags or automatic restraints. The federal standard specifically allowed automobile manufacturers the option to equip their vehicles with manual restraints, automatic restraints or air bags. We found that the standard was intended to maintain flexibility and give the manufacturers an option of which type of safety equipment to include and that allowing a suit under Pennsylvania common law based on the failure to include air bags or automatic restraints would frustrate this purpose. Id. at 1124. We stated that there was clear legislative history that the flexibility and choice provided by allowing manufacturers the choice of three safety devices was an "essential element" of the regulatory framework of the Safety Act. Id.
 
 
 57
 The district court in this case rejected the appellants' reliance on Pokorny because it found that Pokorny rested "squarely on the importance of uniformity and on a clear congressional intent." At 1312. The district court characterized national uniformity as "a very important concern" in the Pokorny decision but noted that "[m]ost important" was that in Pokorny, congressional intent was clear that the federal regulation was specifically designed to give manufacturers a choice among several options which choice the states could not impair. Id. at 1312.
 
 
 58
 The appellants assert that the district court erroneously rejected their reliance on Pokorny. They contend that the preemption found in Pokorny derived from the fact that Congress provided the manufacturers with the various safety options, one of which would have been eliminated by allowing the suit at common law. They urge that the present case is the same. Congress has given treating physicians the option to balance bill and the Fee Control Act has eliminated that option and thus is preempted.
 
 
 59
 We do not agree with the district court that in Pokorny we were influenced by the need for national uniformity. As discussed above, we discounted national uniformity as a congressional goal for the Safety Act and, accordingly, it was not a basis for our finding of implied preemption of Pennsylvania common law. However, the district court also noted that the most important reason for the result in Pokorny was the clear congressional intent that the federal standard give the manufacturers the right to choose among options and we agree with it in that regard.
 
 
 60
 In Pokorny, we recognized that Congress made its intention to give manufacturers safety options, including using manual seat belts, "repeatedly ... clear in the regulatory history of this particular safety standard." 902 F.2d at 1124. As cited by the court in Pokorny, numerous indications in the legislative history revealed that Congress intended to give the manufacturer flexibility in choosing safety features. Id. In addition, Congress specifically preserved manual seat belts as a safety option in the Safety Act, revealing its intent that they remain an option for compliance with federal restraint system requirements. Id. at 1123-24. But Pokorny is not applicable here for Congress has not acted to ensure that physicians have similar type options. Rather, it has acquiesced in state regulations eliminating or restricting balance billing. Thus, the appellants seek a safe harbor from us for their billing practices which Congress has refused to dredge. The Fee Control Act cannot be an obstacle to the Medicare Act in an abstract sense. Rather, for it to be such an obstacle, the Medicare Act must establish a goal for it to obstruct and this the Medicare Act does not do.
 
 
 61
 We close our opinion with a discussion of the persuasive reasoning of the court of appeals in Massachusetts Medical, 815 F.2d 790, a case to which we have already made reference, in which the interference argument made here was also made and rejected. The court in Massachusetts Medical rejected the argument that a state law banning balance billing interfered with Medicare's objectives because it found that the plaintiffs had failed to show that the balance billing option was a right to balance bill intended to be preserved from state regulation. Rather, the court stated that balance billing was simply a current practice which Congress had left undisturbed. 815 F.2d at 793.[9]
 
 
 62
 The plaintiffs in Massachusetts Medical argued that balance billing was a federally protected right. They based this argument on the language of the statute which provided for balance billing; remarks by the legislator principally responsible for the Medicare statute to the effect that Medicare was not intended to prevent physicians from charging more than the allowable charge under the federal statute; and the fact that in 1984 Congress specifically rejected a proposal to end balance billing for services to Medicare patients. Id. The appellants rely on virtually the same evidence.
 
 
 63
 Although the court of appeals in Massachusetts Medical did not discount this evidence totally, it found it insufficient to show that Congress intended to create a right to balance bill, a prerequisite to a successful preemption challenge. Id. The court stated that the plaintiffs had not given it "persuasive reasons" to abandon the assumption that Congress did not intend to displace state law. Id. at 793-94. The evidence presented by the plaintiffs was just as indicative of a simple intent to leave existing fee practices undisturbed, which intent was consistent with subsequent state decisions to regulate balance billing. Id. at 794.
 
 
 64
 The court of appeals stated that based on a rereading of the language and history of the Medicare Act, it was at best ambiguous whether Congress meant to leave the practice of balance billing undisturbed or to create a right to balance bill. The court noted that nowhere in the act, nor in the legislative history, was the word "right" used in reference to balance billing. The court saw congressional remarks regarding balance billing as indicating merely that physicians' organizations stopped a federal ban on balance billing, but were not proof of a related victory over a state ban. The court also rejected the fact that Congress did not impose a federal ban in 1984 as proof that Congress intended to protect balance billing from state regulation. Id. at 794.
 
 
 65
 The court of appeals rejected the arguments regarding congressional intent for the Medicare Act. The plaintiffs contended that the purpose of the act--to ensure adequate medical care for the elderly--implied that Congress must have meant to give physicians the option to balance bill because without that option, physicians might refuse to treat Medicare patients. The plaintiffs argued that in allowing balance billing, Congress struck a balance between the goals of affordability and access and that the state statute upset this balance. Id.
 
 
 66
 The court of appeals again rejected the reliance on language in the congressional debates and, as far as the argument as to what Congress must have meant, the court was equally unconvinced. The court stated that the plaintiffs offered no convincing theoretical reason why Congress would not or could not have wanted to leave a decision whether to ban balance billing to the states. In this vein, the court noted that a state is likely to be as concerned with the health of its elderly citizens as the federal government. Thus, a state would not wish to act in a way to hurt these citizens and would be cautious in determining whether to ban balance billing. Further, the court noted that an individual state might be better able to strike a balance between cost and access in a way best designed to serve its older citizens. Id. at 795.[10]
 
 
 67
 The court of appeals considered and rejected the numerous cases relied on by the plaintiffs in support of their argument that the balance billing ban violated a federally granted option. Id. at 795-96. Some of the cases relied on by the plaintiffs in Massachusetts Medical are cited by the appellants here for the same proposition. The court of appeals concluded that in each of the cases cited the Supreme Court had found that Congress had created or guaranteed a strong right intended to be immune from state interference. Id. at 796 (citing, inter alia, Fidelity Federal Savings and Loan Assoc., 458 U.S. 141, 158, 102 S.Ct. 3014, 3025, 73 L.Ed.2d 664 (1982) (noting that the Federal Home Loan Bank Board had specified that due-on-sale practices shall be " 'governed exclusively by federal law' " and that " 'Federal associations shall not be bound by or subject to any conflicting State law which imposes different ... due-on-sale requirements' " which unequivocally revealed the Board's determination to displace state law); Ridgway v. Ridgway, 454 U.S. 46, 59-60, 102 S.Ct. 49, 57, 70 L.Ed.2d 39 (1981) (holding that "[f]ederal law and federal regulations bestow upon the service member an absolute right to designate [a life insurance] policy beneficiary" preempting a state court divorce decree ordering that a policyholder maintain the policy with his children as beneficiaries); Hisquierdo v. Hisquierdo, 439 U.S. 572, 584, 99 S.Ct. 802, 809, 59 L.Ed.2d 1 (1979) (noting that the Railroad Retirement Act specifies that its benefits shall accrue " '[n]otwithstanding any other law ... of any State' " preempting California community property law); Franklin Nat'l Bank of Franklin Square v. New York, 347 U.S. 373, 377, 74 S.Ct. 550, 553, 98 L.Ed. 767 (1954) (reading the Federal Reserve Act to confer "the right of a national bank" to act as a savings bank, preempting a state statute forbidding the use of "savings" in advertising by national banks); Wissner v. Wissner, 338 U.S. 655, 658, 70 S.Ct. 398, 400, 94 L.Ed. 424 (1950) (noting the National Life Insurance Act provision that servicemen " 'shall have the right to designate' " life insurance beneficiaries, thereby preempting California community property law)). These cases support the general proposition that a showing of clear congressional intent is required before a finding of preemption can be made.
 
 
 68
 The Massachusetts Medical court found no evidence that Congress intended to create a right to balance bill. The plaintiffs there had proven no more than that Congress chose to leave preexisting billing practices undisturbed. Therefore, the court concluded that the Massachusetts balance billing ban was not a significant obstacle to any congressional purpose for the Medicare Act. 815 F.2d at 796.
 
 
 69
 We follow the convincing reasoning of the court of appeals in Massachusetts Medical. Although the plaintiffs there offered some scattered evidence to support their claims, they were not able to provide clear evidence of congressional intent to preempt state regulation of billing practices. Such clear proof is a requirement for a finding of preemption because courts are not eager to find that a state is precluded from acting pursuant to its police powers. The case before us is a virtual mirror image of Massachusetts Medical, and we are persuaded that the court's reasoning there applies with equal force to this case. The appellants are not able to point to clear and unequivocal indications of congressional intent that balance billing is a right or that it is such an integral part of the federal regulatory scheme that Congress intended to shield it from state supplementation.
 
 
 70
 We recognize that Massachusetts Medical was decided prior to the recent amendments to the Medicare Act enacting balance billing caps and limitations. However, this fact does not undermine the reasoning of the court in Massachusetts Medical. Particularly since these amendments were made with knowledge of states' attempts to ban balance billing, the fact that Congress placed limitations and caps on balance billing but made no express statement precluding state regulation of it supports the inference that Congress was not acting to protect balance billing from state regulation. In fact, that Congress limited balance billing without specifically protecting it from state regulation supports the inference that it was not adverse to state supplementation of its own regulation. Rather, the amendments demonstrate that the right to balance bill is not sacrosanct and rather than protecting balance billing limited it. At most the amendments are a recognition that balance billing is the status quo, but they by no means can be seen as evincing an intention to make balance billing a right protected from state interference.
 
 
 71
 We conclude that the appellants have failed to prove that the Fee Control Act interferes with congressional goals for the Medicare program or that it interferes with the methods chosen to achieve those goals.
 
 VI.
 CONCLUSION
 
 72
 The district court's order of January 30, 1991, granting summary judgment for the appellees and denying summary judgment for the appellants will be affirmed.
 
 
 73
 SLOVITER, Chief Judge, dissenting.
 
 
 74
 The difficulty facing the court in this case is the all too familiar one in which a court, seeking to discern congressional intent from ambiguous statutory language, divides as to that intent because Congress has left us with contradictory signals. Had Congress expressly included a provision, one way or another, as to the states' ability to regulate balance billing notwithstanding the detailed provisions on that subject in its most recent amendments to the Medicare Act, this issue would never have arisen. Congress's failure to so provide leaves us searching for clues. They lead me to a different result than that which the majority reaches.
 
 
 75
 As an initial matter, I believe that the majority errs in holding that the district court properly applied a presumption of validity to the Pennsylvania Health Care Practitioners Medicare Fee Control Act (Act). I do not dispute that a presumption of validity generally applies to state laws concerning matters of traditional state concern, see California v. Arc America Corp., 490 U.S. 93, 101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989) ("When Congress legislates in a field traditionally occupied by the States, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), or that the regulation of the public health is such a matter. See Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985) (regulation of health and safety matters is primarily and historically matter of local concern); Great Atlantic & Pacific Tea Co. v. Cottrell, 424 U.S. 366, 371, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976) (states retain broad power under constitutional scheme to legislate protection for their citizens in matters of local concern such as public health).
 
 
 76
 These principles are inapplicable here. I think it is taking too great a leap to conclude that a state statute that regulates doctors' fees, and in particular only certain doctors' fees charged to certain patients, is a matter of traditional state concern.
 
 
 77
 In Hillsborough, the regulations deemed within the state's traditional police power were designed to prevent the transmission of hepatitis by blood donors. In contrast, Pennsylvania's Medicare Fee Control Act is not directed to the broad issue of the public health. Nothing in Pennsylvania's Act speaks to the substantive practice of medicine, such as who can be licensed, or the manner in which medical services are provided.[1]
 
 
 78
 Assuming that control of fees for medical services would be a permissible regulation of public health under some circumstances, it does not follow that this economic regulation should be viewed as within the state's traditional power inasmuch as there has been no showing of a history of state oversight over medical fees. Although the Act's preamble refers to "the continuing escalation of costs for health care services," the Act is not designed to redress the problem of high medical fees to the indigent; its application is limited to patients on Medicare, some of whom are not indigent, and it does not address the fees doctors can charge to non-elderly indigents. Because its application is limited to doctors who treat patients on Medicare, and there has been no showing of a particular problem warranting the exercise of state police power to redress that problem, I would not treat this Act as entitled to a presumption of validity.
 
 
 79
 Indeed, not only do I believe that price control over physicians' fees is not an area of traditional state regulation, but I believe that any presumption of validity is countered by the fact that the state Act targets only those doctors (and patients) participating in a federal program. The state's connection with the federal Medicare Act is nonexistent. The federal Medicare Act creates an exclusively federal program which provides for its administration by local insurance carriers under the direction of the Department of Health and Human Services. 42 U.S.C. § 1395u (1988). The Medicare program is funded solely with federal dollars. Unlike the Medicaid program in which the states contribute both funding and administrative oversight, the Medicare program has no state involvement at all.
 
 
 80
 Under these circumstances, rather than being viewed as presumptively valid, the Pennsylvania Act should be viewed as suspect, which is the general approach taken in preemption cases when the state has enacted a law that targets a federal program. See Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988) (Georgia garnishment law singling out ERISA benefit plans for different treatment than non-ERISA benefit plans preempted, but generally applicable Georgia garnishment law not preempted by ERISA); Raskin v. Moran, 684 F.2d 472 (7th Cir.1982) (striking down state law that decreased salaries of state's reserve judges by exact amount of federal Social Security benefits they received); cf. Felder v. Casey, 487 U.S. 131, 144, 108 S.Ct. 2302, 2309-10, 101 L.Ed.2d 123 (1988) (state notice-of-claim statute preempted in § 1983 suits in part because rather than being a neutral, uniformly applicable procedural rule, statute extends protections only to governmental defendants, thereby conditioning the right to bring suit against the very persons and entities Congress intended to subject to liability).
 
 
 81
 These courts have implicitly recognized that it is anomalous to presume that a state may enact non-neutral laws directed at and affecting exclusively federal programs. As the Supreme Court held in Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 308-09, 108 S.Ct. 1145, 1155, 99 L.Ed.2d 316 (1988), a state law whose central purpose is to regulate matters that Congress intended a federal agency to regulate is preempted. By applying a presumption of validity before determining the congressional intent to occupy the field, the majority tilts the analysis. Even if we would not hold that a state statute targeting participants in a federal program for state regulation is presumptively invalid, it certainly should not be presumed to be valid.
 
 
 82
 Turning then to the issue of implicit preemption, I note that the majority reaches its conclusion that Congress intended that states be permitted to ban balance billing based on a statement of legislative history, the awareness by Congress of several state laws precluding balance billing, a 1986 First Circuit case, and "the very complexity of the Medicare legislation." See Majority Op. at 851. I will consider each in turn.
 
 
 83
 The majority cites to one sentence of the House Ways and Means Committee Report that accompanied the House version of OBRA '89 that expressly acknowledges that states may require assignment. Were this a report of a Conference Committee which had reconciled two conflicting bills into a final version, it would be a clear statement of intent entitled to some weight in light of the ambiguity in the statute. However, that Report merely accompanied an earlier version of the bill ultimately passed. The district court discounted the statement because there is no way to ascertain whether this statement was approved by the committee. More significant for me are the facts that the bill underwent extensive revisions before it was finally enacted as OBRA '89, and that the final bill was accompanied by a Conference Report that contains no language whatsoever concerning state mandatory assignment laws. Thus, this single sentence taken from thousands of pages of legislative history provides little support for the majority's conclusion.
 
 
 84
 The majority places great significance on the fact that although Congress was aware of four states' restrictions on balance billing and the similar efforts by numerous other states, it nonetheless failed to incorporate a preemption statement into the Medicare Act. The majority states, "[s]urely if Congress intended to occupy the field it would have expelled the state intruders." Majority Op. at 851.
 
 
 85
 With respect to this argument, I agree with the district court that "congressional silence is a notoriously bad barometer of congressional purpose." 755 F.Supp. at 1309; Op. at 845; see also Schneidewind, 485 U.S. at 306, 108 S.Ct. at 1154 (Court generally reluctant to draw inferences from Congress's failure to act). If silence alone were enough to defeat preemption, there would be no doctrine of implicit preemption which is predicated on the absence of any explicit statutory provision regarding preemption.
 
 
 86
 Next, the majority relies on Massachusetts Medical Soc'y v. Dukakis, 815 F.2d 790 (1st Cir.), cert. denied, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987), which also involved a Supremacy Clause challenge to a state law banning balance billing. The majority concludes that Massachusetts Medical provides strong support for the defendants in this case because the medical societies here rely on "virtually the same evidence" that the plaintiffs unsuccessfully proffered in Massachusetts Medical to show a Congressional intent to preempt the state law. Majority Op. at 855. The plaintiffs in that case relied on statutory language that provided for balance billing; remarks by Representative Mills, a principal architect of the Medicare Act, to the effect that Medicare was not intended to prevent doctors from charging more than the allowable charge as defined in the Medicare Act; and Congress's specific rejection of a proposal to eliminate balance billing. 815 F.2d at 792-93. The Massachusetts Medical court stated that this evidence supported a conclusion that Congress simply intended to leave existing fee-setting practices undisturbed and the states free to regulate balance billing individually, and that therefore the plaintiffs failed to show an unmistakable congressional intent to create a right to balance bill.
 
 
 87
 Massachusetts Medical, however, reached its conclusion on the basis of a presumption of validity to the state law, which, as noted above, I believe is inapplicable in this situation. In any event, I agree with the district court that Massachusetts Medical is largely inapposite to the present case because the regulatory landscape has changed considerably since that opinion was rendered. Even if the provisions of OBRA '86 regarding balance billing were not enough to occupy the field, the far more extensive provisions set forth in OBRA '89 present this issue in a far different light.
 
 
 88
 It is anomalous that the majority uses the very complexity of the Medicare program as support for its conclusion of no preemption. I believe just the contrary. I view the federal statutory scheme in OBRA '89 regulating assignment and balance billing in intricate detail as indicating that Congress has made a deliberate policy balance and left little room for state supplementation.
 
 
 89
 To briefly recapitulate the Medicare scheme with respect to medical fees, the Act sets forth specific procedures for setting the reasonable charges applicable to all medical services rendered. 42 U.S.C. § 1395x(v). After Congress received the 1988 report of the Physician Payment Review Commission (PPRC) recommending retention of balance billing but recommending new caps on balance billing and a total prohibition on balance billing for the elderly poor, Congress enacted OBRA '89 which established a limiting charge in balance billing of no more than twenty-five percent over the recognized payment amount for 1991, no more than twenty percent in 1992, and no more than fifteen percent in 1993 and thereafter. 42 U.S.C.A. § 1395w-4(g)(2) (West Supp.1991). In OBRA '89 Congress also prohibited balance billing altogether for the elderly poor who are eligible for both Medicare and Medicaid assistance. Furthermore, Congress reduced the Medicare allowed charges and imposed caps on balance billing for specific medical services deemed to be overvalued in comparison to other services. Indeed, the majority concedes that "Congress has dealt in intimate fashion with balance billing." Majority Op. at 849.
 
 
 90
 It is hard to imagine a legislative program that more completely occupies the field of balance billing by physicians than one that expressly states which Medicare patients may not be subject to balance billing, imposes a limit on the amount of balance billing for the remainder of Medicare patients, and deals specifically and separately with certain defined services.
 
 
 91
 Nor do I agree with the majority's conclusion that a state act banning balance billing will not present an obstacle to the accomplishment of Congress's objective in enacting the federal legislation. It is significant that the PPRC, an advisory body formed to report to Congress about the Medicare program, specifically recommended that it not ban balance billing. The PPRC stated that although the elimination of balance billing might mean that Medicare patients could receive needed services at more affordable rates, "[t]he balance billing allowed under current Medicare policy serves as something of a safety valve against the deterioration of quality and access that could result if Medicare sets its fees too low and forbids balance billing." Physician Payment Review Commission, 1988 Annual Report to Congress 173 (March 31, 1988) (hereinafter PPRC 1988 Annual Report).
 
 
 92
 The majority rejects as "sheer speculation" the possibility that eliminating balance billing will result in a reduction of access to physicians' services. Majority Op. at 853. What is significant is not this court's view of the likelihood of a reduced access to services, but Congress's apparent decision, upon the recommendation of its own agency which studied the question, that the danger of reduced services was real enough to retain the balance billing safety valve.
 
 
 93
 The PPRC also articulated a concern about the effect of a balance billing ban on the federal budget. See PPRC 1988 Report at 173 ("Given pressures on the federal budget and the high charge reduction rates in Medicare in recent years, such a safety valve might prove important."). More specifically, it opined that reimbursement costs to the federal government of the Medicare program will increase if recipients' lower medical bills result in their increased utilization of physician services. See id. at 169 ("With lower out-of-pocket costs [from reduced balance billing], beneficiaries would probably use more services, thereby increasing Medicare Part B spending. Some of the increased care would be appropriate, but some would not.") (footnote omitted); Holahan & Zuckerman, Medicare Mandatory Assignment: An Unnecessary Risk, Health Affairs 66, 75 (Spring 1989) ("the potential exists for increased demand by beneficiaries due to the elimination of balance billing[; d]emand would increase because patients would only face deductible and coinsurance obligations causing the net price of care to fall"). Unlike the majority, I assume that the view of an agency established by Congress for this very purpose played a role in the delicate balance Congress struck in retaining balance billing. In fact, were Congress not concerned about the effect of billing limitations on the availability of medical services, it is unlikely it would have increased the cap on fees charged for "evaluative and management services" from 25% to 40% in OBRA '90. See 42 U.S.C.A. § 1395w-4(g)(2)(A) (West Supp.1991).
 
 
 94
 I find it difficult to envision how state action on this subject could not present a conflict with the congressional scheme. The majority must concede that were a state to enact a law permitting balance billing up to 50% over the allowable charge in 1991, 40% over in 1992, and 25% over in 1993 and thereafter, it would conflict with the congressional mandate of 25%, 20%, and 15% respectively for those years. Similarly, it seems to me that a state statute tinkering with the same limits and imposing the more limited caps of 15%, 10% and 5% for those years would also be invalid. I see no reason why a state statute eliminating all the caps Congress imposed should not also be deemed preempted. See International Paper Co. v. Ouellette, 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987) ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach [the ultimate goal of both federal and state laws of eliminating water pollution.]").
 
 
 95
 The issue before us is not whether balance billing of Medicare patients is good or bad, reasonable or unreasonable, social or antisocial. It is simply whether beneficiaries and participants in a carefully titrated federal program which has, since its inception, sought to accommodate the views and needs of patients and providers alike, should be compelled to rely for their protection from what may be deemed to be excess charges on the statute and administrative scheme Congress enacted and supervises or whether the various states may superimpose their own, and potentially different, schemes. I respectfully dissent, and would have reversed the judgment of the district court.
 
 
 
 [1]
 While as a matter of convenience we are referring to the persons regulated by the statutes as physicians, other persons are also subject to the Fee Control Act as they are providers under Medicare
 
 
 [2]
 Medicare's reasonable charge is determined from a complicated set of formulae found in the Medicare Act, regulations and manuals. See 42 U.S.C.A. §§ 1395u(b)(3), 1395x(v) (West 1983 & West Supp.1991); 42 C.F.R. §§ 405.502-405.504 (1990). Beginning in 1992, this system will be replaced by a national fee schedule. See 42 U.S.C.A. § 1395w-4(a)(1) (West Supp.1991)
 
 
 [3]
 Congress recently adjusted this cap in the Omnibus Budget Reconciliation Act of 1990, Pub.L. 101-508, 104 Stat. 1388. Specifically, section 4116 raised the limiting charge for "evaluative and management services" from 25% to 40% in 1991. See 42 U.S.C.A. § 1395w-4(g)(2)(A) (West Supp.1991)
 
 
 [4]
 We note support for the determination that the Fee Control Act regulates an area traditionally occupied by the states in the Medicare Act itself, which provides:
 Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services....
 42 U.S.C. § 1395.
 We regard this provision as recognizing that the practice of medicine is, in general, a subject of state regulation.
 
 
 [5]
 Although not urged by either party, we recognize that an argument could be made that the presumption of validity favoring the police powers function might be inapplicable in a conflict analysis. If a conflict exists, that would dispose of the issue, and a challenging party need not prove congressional intent to preempt state regulation. If the presumption is inapplicable to a conflict analysis, that inapplicability derives not from the presumption's invalidity but from lack of necessity. It is axiomatic that Congress would not intend to allow state legislation to conflict with federal legislation. Thus, if the presumption of validity is not explicitly implicated in a conflict analysis, it is because by its very nature that analysis assumes that if a conflict exists, the state statute cannot be valid. This is unlike an occupation analysis in which the issue is whether Congress intended state and federal regulation to coexist. We note, however, that the Supreme Court has spoken of the presumption of validity in the context of a conflict analysis. Therefore, our discussion treats the presumption as applicable to both occupation and conflict analysis. See Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 716, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985) ("Appellee must thus present a showing of implicit pre-emption of the whole field, or of a conflict ..., that is strong enough to overcome the presumption that state and local regulation ... can constitutionally coexist with federal regulation.")
 
 
 [6]
 The appellants urge that Ford Motor Co. v. Insurance Comm'r, is not applicable because it dealt with agency regulation. This argument is unpersuasive. In that case we observed that because agencies normally address problems in a detailed manner, it could be expected that if an agency had a preemption intention it would be made clear. 874 F.2d at 939. However, this statement does not negate the more general statement, referenced above, that the complexity of a statute, without an explicit preemption provision, indicates congressional intent not to preempt. Id
 
 
 [7]
 We note that the appellants characterized their argument here differently from the way it was set forth in the district court. The district court opinion reflects that the appellants urged that the Pennsylvania statute was preempted because it robbed them of a federally-granted option to balance bill and because it negated the federal provision that physician participation in the Medicare program be voluntary. However, the difference is more of form than substance. In arguing that the Fee Control Act interferes with the chosen methods to implement Medicare, the appellants are really arguing that it interferes with a congressionally created right to balance bill, which they claim is the chosen method at issue
 
 
 [8]
 The parties filed a stipulation of facts on the motion for summary judgment which did not specify that a ban of balance billing would reduce the availability of physicians' services to Medicare patients
 
 
 [9]
 We note here that the appellants characterize their argument in terms of balance billing being an "integral part" of the Medicare program. As discussed, the Massachusetts Medical court analyzed the issue in terms of the right to balance bill. Although there might be varying aspects to these different characterizations, the underlying issue as to each is whether Congress intended to protect the federal legislation from any state regulation. As such, the analyses are ultimately the same, congressional intent being the focus
 
 
 [10]
 Although we are in general agreement with the reasoning in Massachusetts Medical, we recognize that simply because the state ban on balance billing also seeks to promote the good health of elderly citizens does not automatically preclude preemption. Similarity of purpose between state and federal regulation is insufficient to defeat preemption when the state law "interferes with the methods by which the federal statute was designed to reach [its] goal." International Paper Co. v. Ouellette, 479 U.S. 481, 494, 107 S.Ct. 805, 813, 93 L.Ed.2d 883 (1987). However, as discussed above, we do not find that the Fee Control Act intereferes with the methods by which the Medicare statute was designed to reach its goal
 
 
 [1]
 The majority cites 42 U.S.C. § 1395 (1988), one of the provisions of the federal Medicare Act, in support of its proposition that Pennsylvania's Medicare Fee Control Act regulates an area traditionally occupied by the states. Majority Op. at 846 n. 4. However, the subjects left to state supervision and control in section 1395 are (1) the practice of medicine; (2) the manner in which medical services are provided; and (3) the selection, tenure and compensation of health care providers. I do not understand the majority to argue that the Pennsylvania Act deals with the substantive practice of medicine within (1) and (2) above. Subsection (3) is not directed to doctors' billing issues, but to "the personnel policies of providers of health care." See S.Rep. No. 404, 89th Cong., 1st Sess., reprinted in 1965 U.S.Code Cong. & Admin.News, 1943, 2098. Thus, the reference to section 1395 is irrelevant